Jordan S. Stanzler (SBN 54620)
Teresa R. Morimoto (SBN 139643)
Jeffrey M. Curtiss (SBN 239199)
STANZLER FUNDERBURK & CASTELLON LLP
2275 E. Bayshore Rd., Ste. 100
Palo Alto, California 94303
Telephone: (650) 739-0200
Facsimile: (650) 739-0916

Attorneys for Plaintiffs
Tyco Thermal Controls LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

TYCO THERMAL CONTROLS LLC,

           Plaintiff,

       v.

REDWOOD INDUSTRIALS, et al.,

           Defendants.

AND RELATED COUNTER-CLAIMS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. C-06-07164 JF/RS

**PLAINTIFF TYCO THERMAL CONTROLS, LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION; CONCISE STATEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

Date: December 11, 2009
Time: 9:00 a.m.
Ctrm.: 3

Complaint Filed: Nov. 17, 2006
Trial Date: April 23, 2010

Judge: Hon. Jeremy Fogel

1

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................. -ii-

CONCISE STATEMENT ..................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES ............................. 3

I.      INTRODUCTION ..................................................... 3

II.     UNDISPUTED FACTS ................................................ 4

        A.      ENVIRONMENTAL DATA ...................................... 4

        B.      OWNERSHIP AND LEASE OF THE PROPERTY ..................... 5

III.    LEGAL ANALYSIS .................................................. 6

        A.      DEFENDANT ROWE IS LIABLE UNDER CERCLA ................... 6

                1.      Defendant Rowe is a Responsible Party ................... 7

                2.      Usage of PCBs at the Site by HILL INDUSTRIES ............ 13

                        a.      Monsanto Deliveries ............................ 13

                        b.      Manufacture of Electrical Transformers ........... 14

                        c.      Cessation of PCB Usage ......................... 14

                3.      The Site is a Disposal Facility ....................... 14

                4.      There Has Been a Release of PCBs from the Facility ......... 15

                5.      Plaintiff Has Incurred Necessary Costs in Response Consistent with the
                        National Oil and Hazardous Substances Pollution Contingency Plan
                        ("NCP") .......................................... 16

                        a.      Plaintiff's Costs Are Necessary Costs in Response ........... 17

                        b.      Plaintiff's Necessary Costs of Response Actions Were Incurred
                                Consistent with the NCP ........................... 18

                        c.      Plaintiff Has Provided an Opportunity for Public Comment .... 22

                6.      Defendant Rowe Has No Defense ........................ 23

        B.      DEFENDANT ROWE IS LIABLE UNDER HSAA ..................... 23

IV.     CONCLUSION ..................................................... 24

i

28

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>                                                                                          <u>**Pages**</u>

3

4  *Amoco Oil Co. v. Borden,*
   889 F. 2d 664 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

5  *Ascon Properties, Inc. v. Mobil Oil Co.,*
   866 F.2d 1149 (9th Cir. 1989), *cert. denied*, 500 U.S. 917 (1991) . . . . . . . . . . . . . . . . . . . . . . . 7

6

7  *Atchison, Topeka and Sante Fe Railway Company v. Brown & Bryant, Inc.,*
   159 F.3d 358, 361 (9th Cir. 1998) overruled in part by *Burlington Northern and Sante Fe*
8  *Railway Co. v. U.S.,* 129 S.Ct. 1870 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9  *Cadillac Fairview v. Dow Chem. Co.,*
   840 F.2d 691 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10
   *Carson Harbor Village, Ltd. v. Unocal Corp.,*
11  270 F.3d 863 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

12  *Castaic Lake Water Agency v. Whittaker Corp.,*
   272 F. Supplemental. 2d 1053 (C.D.Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

13
   *Church v. General Electric Co.,*
14  138 F. Supp.2d 169 (D.Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

15  *Emhart Industries, Inc. v. Duracell International, Inc.,*
   665 F.Supp. 549 (M.D. Tenn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16
   *Environmental Defense Fund v. EPA,*
17  598 F.2d 62 (D.D.C. 1978 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18  *Kalamazoo River Study Group v. Menasha Corp.,*
   228 F. 3d 648 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19
   *KFC Western, Inc. v. Meghrig,*
20  23 Cal.App.4th 1167 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21  *Krygoski Const. Co., Inc., v. City of Menominee,*
   431 F.Supp.2d 755 (W.D. Mich. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

22
   *Louisiana-Pacific Corp. v. Asarco,*
23  909 F.2d 1260 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24  *Nixon-Egli Equipment Co. v. John A. Alexander Co.,*
   949 F. Supp. 1435 (C.D.Cal.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

25
   *Pierson Sand & Gravel, Inc., v. Pierson Township,*
26  89 F.3d 835 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

27  *United States v. Stringfellow,*
   661 F. Supp. 1053 (C.D.Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28

*United States v. Alcan Aluminum Corp.,*
964 F.2d 252 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Westfarm Associates Limited Partnership v. Washington Sanitary Comm'n,*
66 F.3d 669 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wickland Oil Terminals v. Asarco, Inc.,*
792 F.2d 887 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*3550 Stevens Creek Assocs. v. Barclays Bank of California,*
915 F.2d 1355 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATUTES AND RULES

F.R. Evidence § 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

F.R. Evidence §901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 9601(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 9605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. §§ 9706(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

42 U.S. C. 9607(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. §9607(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 13

42 U.S.C. §9607(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 300.430(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

40 C.F.R. § 300.700(c)(3)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

California Health & Safety Code § 25363(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1  Jordan S. Stanzler (SBN 54620)
   Teresa R. Morimoto (SBN 139643)
2  Jeffrey M. Curtiss (SBN 239199)
   STANZLER FUNDERBURK & CASTELLON LLP
3  2275 E. Bayshore Rd., Ste. 100
   Palo Alto, California  94303
4  Telephone:  (650) 739-0200
   Facsimile:   (650) 739-0916
5
   Attorneys for Plaintiffs
6  Tyco Thermal Controls LLC
7
8                    UNITED STATES DISTRICT COURT
9        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
10
11 TYCO THERMAL CONTROLS LLC,          )  Case No. C-06-07164 JF/RS
                                       )
12               Plaintiff,            )  **PLAINTIFF TYCO**
                                       )  **THERMAL CONTROLS,**
13                                     )  **LLC'S NOTICE OF MOTION**
         v.                            )  **AND MOTION FOR**
14                                     )  **SUMMARY ADJUDICATION;**
                                       )  **CONCISE STATEMENT;**
15 REDWOOD INDUSTRIALS, et al.,        )  **MEMORANDUM OF POINTS**
                                       )  **AND AUTHORITIES IN**
16               Defendants.           )  **SUPPORT OF MOTION**
                                       )
17 ─────────────────────────────       )
                                       )  Date:        December 11, 2009
18                                     )  Time:        9:00 a.m.
                                       )  Ctrm.:       3
19 AND RELATED COUNTER-CLAIMS          )
                                       )  Complaint Filed:  Nov. 17, 2006
20                                     )  Trial Date:        April 23, 2010
                                       )
21 ─────────────────────────────       )  Judge: Hon. Jeremy Fogel
                                       )
22
         **TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD**:
23
         NOTICE IS HEREBY GIVEN that on December 11, 2009 at 9:00 a.m., or as soon
24
   thereafter as the matter may be heard by the above-entitled Court, located at 280 South 1st Street,
25
   San Jose, California, in Courtroom 3, before the Hon.  Jeremy Fogel, Plaintiff TYCO
26
   THERMAL CONTROLS, LLC ("Plaintiff") will and hereby does move the Court for an order
27
   granting summary adjudication of Defendant ROWE INDUSTRIES' liability for claims under
28
                                       1

1  Comprehensive Environmental Response, Compensation and Liability Act and the California

2  Hazardous Substances Account Act.

3      This motion is brought on the following grounds: that pursuant to Federal Rule of Civil

4  Procedure 56 a party may move for summary adjudication of issues, including an interlocutory

5  summary judgment on liability alone, even if there is a genuine issue on the amount of damages.

6      This motion is based on this Notice of Motion and Motion, the Memorandum of Points

7  and Authorities filed herewith, the Declaration of Jordan S. Stanzler filed herewith, the

8  Declaration of Deborah Belleau filed herewith, the Declaration of Margaret K. Peischl filed

9  herewith, the Declaration of Mara Feeney filed herewith, the pleadings and papers on file herein,

10  and upon such other matters as may be presented to the Court at the time of the hearing.

11  **CONCISE STATEMENT**

12      Plaintiff TYCO THERMAL CONTROLS, LLC ("TYCO THERMAL") sets forth this

13  Memorandum of Points and Authorites in support of its Motion for Summary Adjudication of the

14  liability of Defendant ROWE INDUSTRIES ("ROWE") under Comprehensive Environmental

15  Response, Compensation and Liability Act ("CERCLA") and the California Hazardous

16  Substances Account Act ("HSAA").

17      In its Answer, paragraph 13, ROWE admits "that it is a Delaware corporation and that it

18  is the successor-in-interest to a company known as Coleman Cable & Wire Company." Coleman

19  Cable & Wire Company is the successor-in-interest to Hill Industries, Inc., the company which

20  purchased over 500,000 pounds of PCBs for use at the site in the period 1965-70. Records from

21  Monsanto Company show that Monsanto delivered the PCBs to the site during this time period.

22      ROWE is therefore the successor to the companies that used PCBs in the period

23  1965–1970 to manufacture electrical transformers. TYCO THERMAL is the present owner of

24  the property. TYCO THERMAL plans to remove PCBs from the property, by excavating and

25  removing the soil, and to monitor groundwater. This remedial action has been approved by the

26  Regional Water Quality Control Board (the governmental body overseeing the site) and will cost

27  approximately $1.6 million. In this motion Plaintiff seeks to recover $284,700.94 for

28

1  environmental investigation, testing, and monitoring of the site and activities required to gain

2  approval of a preferred remediation plan by the overseeing agency.

3      The usage of PCBs at the site stopped in 1973 when the site was sold to Raychem

4  Corporation.  Raychem did not use PCBs at the site.  TYCO THERMAL later acquired the

5  property through various transactions following the acquisition of Raychem by Tyco

6  International in 1999.  Tyco did not use PCBs, either.

7  **MEMORANDUM OF POINTS AND AUTHORITIES**

8  **I.    INTRODUCTION**

9      This case arises from the environmental contamination of the approximately three-acre

10  property commonly known as 2201 Bay Road, Redwood City, California (hereafter, "site" or

11  "property").  During the period 1965-70 a company called HILL INDUSTRIES, Inc., later known

12  as HILL MAGNETICS, INC. and PACIFIC TRANSFORMER (hereafter collectively, "HILL

13  INDUSTRIES") manufactured electrical transformers on this site, using products containing

14  PCBs[1] in the manufacturing process.  During this period HILL INDUSTRIES purchased

15  hundreds of thousands of pounds of PCB mixtures from Monsanto Company.  Monsanto

16  delivered the chemicals by rail in drums and in railroad tanker cars, which came to a loading

17  dock at the rear of the building by means of a railway spur.

18      PCBs have now been detected in the soil beside and beneath the building and must now

19  be removed.  The cost of digging up, removing, transporting, and incinerating the soil and

20  conducting groundwater monitoring is currently estimated at $1.6 million.

21      The current owner of the property, TYCO THERMAL, has paid investigation costs to

22  date exceeding $250,000.  It brought this lawsuit against the company responsible for using

23  PCBs– ROWE, the successor to HILL INDUSTRIES and to COLEMAN CABLE AND WIRE

24  ———————————

25  1.    PCBs are nonflammable liquids that are highly resistant to electrical current and have been widely used to fill electrical transformers, aiding in the storage of electrical charge without creating the fire

26  hazard that would occur if a flammable filler were used.  *Environmental Defense Fund v.  EPA,* 598 F.2d 62, 66 (D.D.C. 1978).  Under CERCLA regulations PCBs are a hazardous substance regardless

27  of their levels.  40 C.F.R. § 302 (Table at 302.4).  "There are no uniformly established safe levels of PCBs."  *Emhart Industries, Inc., v. Duracell International, Inc.,* 665 F.Supp.  549, 559, n15 (M.D.

28  Tenn. 1987).

1  COMPANY ("COLEMAN"). TYCO THERMAL has also brought suit against the prior owners

2  of the property during the period 1965–1973, REDWOOD INDUSTRIALS, a partnership

3  ("REDWOOD"), and its partners ROLAND LAMPERT and AUDREY LAMPERT. TYCO

4  THERMAL has also brought suit against the tenant who sublet the property to HILL

5  INDUSTRIES– CARLISLE CORPORATION ("CARLISLE"), the parent/successor of

6  TENSOLITE INSULATED WIRE PACIFIC DIVISION, INC. and TENSOLITE INSULATED

7  WIRE CO.

8       The only entity which used PCBs at the site is HILL INDUSTRIES. The other

9  parties–TYCO THERMAL, REDWOOD INDUSTRIALS and the CARLISLE CORPORATION

10  – never used PCBs.

11       As discussed more fully below, Defendant ROWE is jointly and severally liable for the

12  costs of investigation and cleanup.

13  **II.     UNDISPUTED FACTS.**

14       The following facts are undisputed and will be discussed in greater detail below.

15       From 1967–1970 Monsanto Company delivered over 550,000 pounds of PCBs to HILL

16  MAGNETICS and PACIFIC TRANSFORMER;

17       PCBs have been detected at very high levels at the site;

18       Plaintiff has incurred and will incur necessary response costs to investigate PCBs, remove

19  them and remediate the site;

20       ROWE is the successor to the companies that purchased and used PCBs– i.e., HILL

21  INDUSTRIES, HILL MAGNETICS, PACIFIC TRANSFORMER and COLEMAN.

22  **A.     ENVIRONMENTAL DATA.**

23       Plaintiff has conducted investigations at the site to evaluate the nature and extent of

24  detected constituents of potential concern (COPCs) in soil, groundwater and soil gas.[2]  Soil and

25  groundwater samples were collected in 1999, 2005, and 2008. Soil gas samples were collected in

26  _____

27  2.     Two categories of chemicals that occur in PCB mixtures–Dichlorobenzenes and Trichlorobenzenes–
       have been detected in soil. Chlorinated solvents and petroleum hydrocarbons have also been detected
28     in soil. PCBs and chlorinated solvents have been detected in groundwater.

4

1   2005.  In March 2008 five groundwater monitoring wells were installed to assess conditions in
2   groundwater at the site.  A Groundwater Monitoring Work Plan was approved by the San
3   Francisco Bay Regional Water Quality Control Board ("Water Board") in 2008, and quarterly
4   groundwater monitoring was conducted in November 2008, February 2009 and May 2009.

5       PCBs have been detected in soil at levels up to 1300 parts per million ("ppm") at certain
6   sampling points.  These levels far exceed the Environmental Screening Level of 0.74 ppm for
7   PCBs in shallow soil where groundwater is a potential drinking water source.[3]

8       **B.       OWNERSHIP AND LEASE OF THE PROPERTY.**

9       On November 5, 1962 a lease agreement for the subject property was entered into
10  between REDWOOD INDUSTRIALS, La Verne Doolittle, Emilie K. Doolittle, Masha Lampert,
11  ROLAND LAMPERT, AUDREY LAMPERT, Morris M. Grupp and Anna M. Grupp (Lessors)
12  and TENSOLITE INSULATED WIRE PACIFIC DIVISION, INC. ("Lessee" or
13  "TENSOLITE") through December 31, 1977.  See the accompanying Declaration of Jordan
14  Stanzler in support of this motion ("Stanzler Decl."), Exhibit A, RI0059.

15      On June 23, 1965 Tensolite (Sublessor) subleased the property to HILL INDUSTRIES,
16  INC. (Sublessee) through December 31, 1977.  Stanzler Decl., Exhibit C, RI0076.

17      From 1965-1973 HILL INDUSTRIES, INC.  manufactured electrical transformers on the
18  site.  During that period, HILL INDUSTRIES, INC. changed its name to HILL MAGNETICS,
19  INC. and later to PACIFIC TRANSFORMER, as described more fully in section B below.

20      In 1973 REDWOOD INDUSTRIALS sold the property to Raychem Corporation.  In
21  order to effectuate the sale, REDWOOD INDUSTRIALS arranged to have its tenant
22  (TENSOLITE) and its subtenant (HILL INDUSTRIES) vacate the property and terminate their
23  leases.  As part of that sale, COLEMAN executed a "Corporate Quitclaim Deed," to surrender its
24  interest in the property.  In that deed COLEMAN represented that it was the "successor in
25  interest to Pacific Transformer Co., Inc., formerly Hill Magnetics, Inc., formerly Hill Industries,

26  _____

27  3.      See generally, AMEC Geomatrix, Inc. Feasability Study, 2201 Bay Road, Redwood City, California,
        December 15, 2008. See, e.g., Table A-15, Summary of Analytical Results for Soil - PCBs attached
28      to the accompanying Declaration of Margaret K. Peischl in support of this motion, Exhibit A.

1  Inc., a corporation organized under the laws of the state of Delaware" and quitclaimed to

2  REDWOOD INDUSTRIALS COLEMAN'S interests in the lease of the property by REDWOOD

3  INDUSTRIALS to TENSOLITE INSULATED WIRE PACIFIC DIVISION, INC.

4      In 1999 Tyco International (PA) Inc. acquired Raychem Corporation.  In 2002 Tyco

5  International (PA) Inc. ("Tyco") issued a grant deed passing title to the property to Plaintiff Tyco

6  Thermal Controls LLC.  Raychem, Tyco and TYCO THERMAL never used PCBs at the site.

7  Only Hill Industries did.

8      In December 2007 Plaintiff submitted a Site Investigation Work Plan to the San Francisco

9  Bay Regional Water Quality Control Board ("Water Board"), which was approved on January

10  28, 2008.[4]  Geomatrix prepared a report of its site investigation results in April 2008.

11      On December 15, 2008, AMEC Geomatrix submitted to the Water Board a feasibility

12  study to evaluate remedial options at the site.  On May 29, 2009, AMEC Geomatrix submitted a

13  draft Remedial Action Plan to the Water Board.  On October 6, 2009 the Water Board approved

14  the Remedial Action Plan.  The plan calls for digging up and removing PCB-contaminated soil

15  and groundwater monitoring at an estimated cost of $1.6 million.  The Water Board requires a

16  Work Plan and time schedule to be submitted by November 30, 2009.  Stanzler Decl., Exhibit R.

17  **III.    LEGAL ANALYSIS**

18          **A.      DEFENDANT ROWE IS LIABLE UNDER CERCLA**

19      Plaintiff has brought this action against ROWE under CERCLA § 107(a)(2), 42 U.S.C. §

20  9607(a)(2).  Plaintiff has made no claim against any governmental Hazardous Substance

21  Response Fund and brings its action in part under the private cause of action for recovery of

22  necessary response costs afforded by CERCLA §§ 107(a)(1-4)(B), 42 U.S.C. §§ 9607(a)(1-4)(B).

23      To prevail in a private cost recovery action, a plaintiff must establish that (1) the site on

24  which the hazardous substances are contained is a "facility" under CERCLA's definition of that

25  term, CERCLA § 101(9), 42 U.S.C. § 9601(9);  (2) a "release" or "threatened release" of any

26  "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4);  (3) such "release"

27  ─────────────

28  4.      Tyco Thermal is subject to the Water Board's Spills, Leaks, Investigation and Cleanup Program.

1  or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and

2  "consistent with the national contingency plan," 42 U.S.C. §§ 9706(a)(4) and 9607(a)(4)(B); and

3  (4) the defendant is within one of four classes of persons subject to the liability provisions of

4  Section 107(a).  *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355,

5  1358 (9th Cir. 1990)(citing *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152 (9th Cir.

6  1989), cert. denied, 500 U.S. 917 (1991).

7       We first discuss ROWE'S status within a class subject to the CERCLA liability

8  provisions and then discuss the other elements of liability.

9       **1.**    **Defendant ROWE is a Responsible Party.**

10      42 U.S.C. § 9607(a)(2) provides as follows:

11  Notwithstanding any other provision or rule of law, and subject only to the defenses set

12  forth in subsection (b) of this section–

13  ...    any person who at the time of disposal of any hazardous substance owned or
    operated any facility at which such hazardous substances were disposed of, ...

14

15      shall be liable for–

16  ...   (B)   any other necessary costs of response incurred by any other person
        consistent with the national contingency plan ...

17          a.    Rowe Is Liable as the Successor in Interest to past Operators under
        § 9607(a)(2)

18

19      ROWE is the successor in interest to the companies that operated and used PCBs at the

20  site.  ROWE is strictly liable as the successor in interest under § 9607(a)(2).

21      Under § 9607(a)(2) any person who at the time of disposal of any hazardous substance

22  owned or operated any facility at which such hazardous substances were disposed of is liable as a

23  Potentially Responsible Party ("POTENTIALLY RESPONSIBLE PARTY").  HILL

24  INDUSTRIES operated the transformer manufacturing facility at the time that PCBs were

25  disposed.  ROWE is the admitted successor in interest of COLEMAN (ROWE's Answer, ¶13,

26  Stanzler Decl., Exhibit N).  COLEMAN in turn is the successor- in- interest of HILL

27  INDUSTRIES, as discussed more fully below.

28

7

1

(a)     ROWE Admits it Succeeds COLEMAN

2

ROWE has admitted in its Answer at paragraph 13 that it is the successor- in- interest to

3

COLEMAN.  Stanzler Decl., Exhibit N.

4

(b)     COLEMAN Is Successor to PACIFIC TRANSFORMER, HILL
MAGNETICS and HILL INDUSTRIES, INC.

5

i.      Quitclaim Deed and Letters

6

In 1973 REDWOOD INDUSTRIES, a partnership, sold the property to Raychem

7

Corporation.  Stanzler Decl., Exhibit J.  At that time REDWOOD INDUSTRIES had leased the

8

property to TENSOLITE which, in turn, had sublet it to HILL INDUSTRIES, INC.

9

The parties contemplated that Redwood Industrials would deliver the property free and

10

clear of tenants, and therefore Redwood Industrials asked the tenants to surrender their interests

11

in their tenancies.  In this context COLEMAN executed a quitclaim deed and wrote various

12

letters acknowledging its interest in the tenancy (as the successor to HILL INDUSTRIES, Hill

13

MAGNETICS and PACIFIC TRANSFORMER) and surrendering that tenancy.

14

COLEMAN executed a Corporation Quitclaim Deed on March 30, 1973 representing that

15

it was the "successor in interest to Pacific Transformer Co., Inc., formerly Hill Magnetics, Inc.

16

formerly Hill Industries, Inc."  Stanzler Decl., Exhibit K.

17

Ted E.  Gaty, the former President of COLEMAN, admits that the signature on the

18

Corporation Quitclaim Deed is his signature.  Stanzler Decl., Exhibit O, Gaty deposition, p.

19

13:6–10 and Exhibit 2 to the deposition of Ted E.  Gaty.

20

COLEMAN'S former President, Ted E.  Gaty, and Secretary, George B.  Pletsch, also

21

wrote a letter to Title Insurance and Trust Company on March 30, 1973, making the same

22

representations:

23

24

"Coleman Cable and Wire Company warrants that it is the successor in interest to Hill
Industries, Inc., Hill Magnetics, Inc., and Pacific Transformer Co., Inc., and that we are
now the holder of the unrecorded sub lease to Hill Industries, Inc., a California

25

Corporation, as disclosed by Notice of Non-Responsibility executed by Redwood
Industrials, a Co-Partnership, dated June 23, 1965 and Recorded June 28, 1965 in Book

26

4979 Official Records of San Mateo County at page 191."

27

Stanzler Decl., Exhibit L (RI 0016).

28

8

1    COLEMAN made the same representation in another letter to Title Insurance and Trust

2  Company entitled "LETTER OF INSTRUCTIONS" also dated March 30, 1973 which states as

3  follows:

4    The undersigned, Ted E. Gaty, President of Coleman Cable & Wire Company, a
    Delaware corporation, hereby certifies that he is authorized to execute the enclosed
5    documents on behalf of Coleman Cable & Wire Company; and further certifies that
    Coleman Cable & Wire Company  was the sole shareholder of Hill Magnetics, Inc.
6    (formerly Hill Industries, Inc.), a California corporation, at the time of its liquidation; and
    that Coleman Cable & Wire Company is the successor-in-interest to, and the present
7    owner of, all of the right, title and interest of said corporation in the above referred to
    Sublease and in the real property described therein.
8

9  Stanzler Decl., Exhibit M, RI0034–0035.

10    COLEMAN has admitted in these three documents that it is the successor in interest to all

11  these companies. Thus ROWE is the successor to all these companies, since it is the successor to

12  COLEMAN.  The deed and the letters constitute admissions against interest and are admissible

13  under the Ancient Documents Rule.[5]  The corporate quitclaim deed here is more than twenty

14  years old, and it is in such condition as to create no suspicion concerning its authenticity.  It is

15  recorded and kept in the official records of the San Mateo County Recorder from which Plaintiff

16  has obtained a certified copy.  As such it is an admissible document.

17  ―――――――――――

18  5.
      F.R. Evidence § 804(b)(3) sets forth in pertinent part as follows:

19
      A statement which was at the time of its making so far contrary to the declarant's pecuniary
20    or proprietary interest, or so far tended to subject the declarant to civil or criminal liability,
      or to render invalid a claim by the declarant against another, that a reasonable person in the
21    declarant's position would not have made the statement unless believing it to be true.

22    F.R. Evidence 901 sets forth in pertinent part as follows:
      (a) General provision.  The requirement of authentication or identification as a condition
23    precedent to admissibility is satisfied by evidence sufficient to support a finding that the
      matter in question is what its proponent claims.
24
      (b) Illustrations. By way of illustration only, and not by way of limitation, the following are
25    examples of authentication or identification conforming with the requirements of this rule:

26    . . . (8) Ancient documents or data compilation. Evidence that a document or data
27    compilation, in any form, (A) is in such condition as to create no suspicion concerning its
      authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in
28    existence 20 years or more at the time it is offered.

1       The letters described above are also more than twenty years old, and they are in such

2 condition as to create no suspicion concerning their authenticity. They were produced by ROWE

3 in this case and presumably were in ROWE'S possession, which is where if authentic they would

4 likely be. A successor in interest would retain such records. The letters would be valuable to

5 ROWE should any dispute arise as to any liability on the sublease interest.

6       (b)    Corporate Documents Also Show That ROWE Is the Successor to COLEMAN

7

8       The corporate history documents also establish this successorship. These documents

9 show that 1) HILL INDUSTRIES changed its name to Hill MAGNETICS; 2) Hill MAGNETICS

10 dissolved and transferred all of its assets to Coleman Fabricating Co., which changed its name to

11 PACIFIC TRANSFORMER CO.; PACIFIC TRANSFORMER CO. dissolved and transferred all

its assets to COLEMAN.

12

13       On August 9, 1963, HILL INDUSTRIES, INC., filed its Articles of Incorporation in the

14 Office of the Secretary of State of California #455797. The corporation's stated purpose was "to

15 engage in the manufacture and sales of magnetic components, transformers, reactors and allied

equipment . . . " Stanzler Decl., Exhibit B, RI0092.

16

17       On September 15, 1965 a Certificate of Amendment of Articles of Incorporation of Hill

18 Industries, Inc., was filed in the Office of the Secretary of State of the State of California

19 amending Articles of Incorporation: The name of the corporation is HILL MAGNETICS, INC.

Stanzler Decl., Exhibit D, RI0095.

20

21       On April 1, 1969, according to a document produced by ROWE, COLEMAN conveyed

22 all assets received by it from HILL MAGNETICS in connection with the liquidation and

23 dissolution of the corporation to Coleman Fabricating Co, the name of which is being changed to

24 PACIFIC TRANSFORMER. There is no mention of any consideration for the sale. Stanzler

Decl,. Exhibit E, RI 0086.

25

26       On April 28, 1969 a Certificate of Election to Dissolve Hill Magnetics, Inc. was filed

27 with the California Secretary of State. Stanzler Decl., Exhibit F, RI 0099.

28

1    In a Statement and Designation by Foreign Corporation dated May 15, 1969 filed in the

2  office of the Secretary of State of the State of California, PACIFIC TRANSFORMER as a

3  corporation organized and existing under the laws of Illinois makes the following statements and

4  designations:

5          1.      The location and address of its main office is 2201 Bay Road, Redwood City,

6                  California 94063.

7          2.      The location of its principal office in the State of California is 2201 Bay Road,

8                  Redwood City, California 94063.

9          3.      The specific business it proposes to transact in the State of California is:

10                 manufacture and sale of transformers and other components for the electrical–

11                 electronic industry.

12  PACIFIC TRANSFORMER by its own admission was still operating in 1969 at 2201 Bay Road,

13  Redwood City, California with the specific business it proposed to transact as the manufacture

14  and sales of transformers and other components for the electrical–electronic industry.  The

15  document is signed by Allan Coleman, Vice-President of Pacific Tranformer Company.  Stanzler

16  Decl., Exhibit G, RI0088–RI 0090.

17         On January 30, 1970, PACIFIC TRANSFORMER set forth in a document that it

18  conveyed its assets to COLEMAN in connection with a dissolution and liquidation:

19         Pursuant to appropriate Resolution of the Board of Directors, PACIFIC
           TRANSFORMER COMPANY, an Illinios Corporation, does hereby and herewith,
20         effective as of the close of business on January 31, 1970, convey all of its assets to
           COLEMAN CABLE & WIRE COMPANY, a Delaware Corporation, in connection with
21         the dissolution and liquidation of the said PACIFIC TRANSFORMER COMPANY.
           Executed this 30th day of January, 1970. [Signed by Allan Coleman, Vice President of
22         Pacific Transformer Company]

23  Stanzler Decl., Exhibit H, RI0087.]

24         Thereafter, as discussed above, on March 30, 1973 COLEMAN filed the "Corporation

25  Quitclaim Deed "; wrote the "Letter of Instructions dated March 30, 1973"; and wrote to Title

26  Insurance and Trust Company.

27         As analyzed below, ROWE is liable as successor in interest to the polluting entities.

28  COLEMAN accepted a transfer of assets from HILL MAGNETICS, and there is no

11

1   documentation that it declined to accept HILL MAGNETICS' liabilities.  COLEMAN then

2   transferred the assets to COLEMAN FABRICATING which changed its name to PACIFIC

3   TRANSFORMER.  COLEMAN was a "straw man" for transfer of assets between HILL

4   MAGNETICS and PACIFIC TRANSFORMER.   Furthermore, there is evidence of continuity of

5   physical location, assets and uninterrupted operations.[6]

6          The PCB use at the site continued without interruption, regardless of the corporate name

7   changes.  There was an uninterrupted continuation of business operations between 1965-1973.

8   As discussed below, delivery documents produced by Monsanto Company show a continuous

9   supply of PCB products sold to the various entities at this site from 1967–1970.  See the

10   accompanying Declaration of Deborah Belleau in support of this motion.

11          The net effect of all these purported transfers was that COLEMAN became successor in

12   interest[7] to these companies, whose operations of making electrical transformers continued

---

6.     Also, Allan Coleman was the President of Coleman Cable & Wire Company and Vice President of
       Pacific Transformer.

7.     Asset purchasers are liable as successor corporations if:

       1.     The purchasing corporation expressly or impliedly agreed to assume the liability;

       2.     The transaction amounted to a "de facto" consolidation or merger;

       3.     The purchasing corporation was merely a continuation of the selling corporation; or

       4.     The transaction was fraudulently entered into in order to escape liability.

*Atchison, Topeka and Sante Fe Railway Company v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1998)
overruled in part by *Burlington Northern and Sante Fe Railway Co. v. U.S.*, 129 S.Ct. 1870 (2009).
       Courts have recognized *de facto* mergers when:

       1.     There is a continuation of the enterprise of the seller in terms of the continuity of
              management, personnel, physical location, assets and operations;
       2.     There is a continuity of shareholders;
       3.     The seller ceases operations, liquidates, and dissolves as soon as legally and practically
              possible; and
       4.     The purchasing corporation assumes the obligations of the seller necessary for uninterrupted
              continuation of business operations.

*Louisiana-Pacific Corp. v. Asarco*, 909 F.2d 1260, 1264 (9th Cir. 1990).

---

PLAINTIFF TYCO THERMAL CONTROLS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

1  uninterrupted at the same physical location– the Bay Road site– as is shown by the deliveries of

2  PCB products from Monsanto.  There was an uninterrupted continuation of business operations

3  and the same product continued to be manufactured, with deliveries to the site of PCBs

4  continuing after PACIFIC TRANSFORMER'S assets were transferred to COLEMAN.  ROWE

5  as successor to COLEMAN is strictly liable under §9607(a)(2) as the successor in interest of

6  HILL MAGNETICS and PACIFIC TRANSFORMER.

7           2.      **Usage of PCBs at the Site by HILL INDUSTRIES**

8                   (a)      Monsanto Deliveries

9           Monsanto Company made the following deliveries of PCBs to the site, according to its

10  sales and shipment records produced in this litigation:

| Delivered to: | Date | Product | Supporting Documents[8] |
|---|---|---|---|
| Hill Magnetics | 1967 | 46,000 pounds | TTC 2939 |
| Hill Magnetics | 2/13/68 | 49,700 pounds | TTC 2933 |
| Hill Magnetics | 3/15/68 | 4,725 pounds | TTC 2913 |
| Hill Magnetics | 4/6/68 | 32,352 pounds | TTC 2915 |
| Hill Magnetics | 6/4/68 | 43,810 pounds | TTC 2916–17 |
| Hill Magnetics | 1968 | 226,000 pounds | TTC 2911 |
| Pacific Transformer | 2/69 | 48,800 pounds | TTC 2944 |
| Pacific Transformer | 11/69 | 49,900 pounds | TTC 2943 |
| Pacific Transformer | 2/13/70 | 49,700 pounds | TTC 2933 |
| TOTAL | | **550,987 pounds** | |

21           Total sales of PBC products by Monsanto Company to HILL MAGNETICS and

22  PACIFIC TRANSFORMER at the site is estimated to total approximately 550,987 pounds.  See

23  the accompanying Declaration of Deborah Belleau.[9]  Monsanto delivered the PCBs by rail in

---

8.    These documents were produced by Monsanto and are attached to the accompanying Declaration
      of Deborah Belleau.

9.    "This figure was calculated using actual numbers, if reflected on the sales summary documents, and
      if none were reflected, using the rounded number on those sales summary documents."  See the

1   drums and by or railway tank cars.  The bulk shipments by tank cars are identified by the

2   notation, "TC" or "tank car."  The shipments in drums are identified by the number of drums.

3   See the accompanying Declaration of Deborah Belleau.

(b)   Manufacture of Electrical Transformers

5   On August 9, 1963 HILL INDUSTRIES filed its Articles of Incorporation stating, "The

6   specific business in which the corporation is primarily to engage is the manufacture and sale of

7   magnetic components, transformers, reactors and allied equipment."  Stanzler Decl., Exhibit B,

8   RI0091–RI0094.

9   From 1967–1970 Monsanto shipped PCB-laden products for use in transformers to HILL

10  MAGNETICS and PACIFIC TRANSFORMER at the Redwood City site.  These shipments

11  continued even after PACIFIC TRANSFORMER conveyed all its assets "in connection with its

12  dissolution and liquidation" to Coleman Cable & Wire Company on January 30, 1970.  The

13  following month, on February 13, 1970, Monsanto sold to PACIFIC TRANSFORMER 49,700

14  pounds of product containing PCBs. Stanzler Decl., Exhibit I, and the accompanying Declaration

15  of Deborah Belleau.

(c)   Cessation of PCB Usage.

17  Raychem Corporation acquired the property in 1973.  See the Real Property Exchange

18  Agreement dated March 28, 1973, Stanzler Decl., Exhibit J.  Raychem and its successor, Tyco

19  International, and TYCO THERMAL never used PCBs at the site.  See deposition testimony of

20  Dr. Kenneth Shell, Stanzler Decl., Exhibit S.

**3.    The Site Is a Disposal Facility.**

22  The property where Defendants manufactured electrical transformers is a facility as PCBs

23  have been stored, placed, and located at and around the property.  As set forth below, it has been

25      accompanying Declaration of Deborah Belleau.  However, Ms. Belleau's calculation includes

26      Monsanto Company sales to Hill Transformer in 1959, 1960 and 1962 with corresponding
        documents which do not show that those sales were delivered to the site. Plaintiff therefore has not

27      used Ms. Belleau's total of approximately 617,786 pounds and instead set forth the actual amounts
        in the table above and instead has calculated 550,987 pounds for sales to HILL MAGNETICS and

28      PACIFIC TRANSFORMER.

14

1  established by analysis of sampling of soil and groundwater at the property that there is PCB

2  contamination.   Hundreds of thousands of pounds of PCBs were delivered by Monsanto to the

3  manufacturers in steel drums and tank cars on rail during the 1960's and 1970's, as shown by

4  documents produced by Monsanto.  Stanzler Decl., Exhibit T and the Declaration of Deborah

5  Belleau.

6          A "facility" is defined in § 9601(9)(B) as "any site or area where a hazardous substance

7  has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not

8  include any consumer product in consumer use  or any vessel."

9          A Site is a disposal or treatment facility if, "a hazardous substance has been deposited,

10 stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

11         It is indisputable that PCBs are hazardous substances[10] that were placed and stored at the

12 site, were deposited in and around the site, and have "come to be located" in the soil at the site --

13 all which necessitate investigation and remediation as required by the Water Board.  See

14 Footnote 1 hereinabove on page 3.  These are releases that establish that the site is a "disposal

15 facility" within the definition of CERCLA.

16              **4.       There Has Been a Release of PCBs from the Facility**

17         Sampling by Plaintiff's environmental consultant of the soil and groundwater shows PCB

18 contamination in the soil at the site.  PCBs have been detected in soil at levels up to 1300 parts

19 per million ("ppm") at certain sampling points.  These levels far exceed the Environmental

20 Screening Level of 0.74 ppm for PCBs in shallow soil where groundwater is a potential drinking

21 water source.  See the accompanying Declaration of Margaret K. Peischl in support of this

22 motion and Footnote 3 hereinabove.

23         A plaintiff need not date and time stamp each molecule of PCB released into the

24 environment in order to recover under CERCLA, HSAA, or common law.  Nor must the plaintiff

25 prove the amount of hazardous waste that has been discharged.  "There is no minimum

26 quantitative requirement to establish a release." *Amoco Oil Co. v. Borden,* 889 F. 2d 664, 668-

27 ───────────────

28 10.    See footnote 1 above.

**PLAINTIFF TYCO THERMAL CONTROLS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

1   669 (5th Cir. 1989)  The plaintiff's burden is simply to prove that there has been a "release" that

2   caused plaintiffs to incur response costs; and that the Defendants are within the class of persons

3   subject to the statute.

4        "Contrary to the rule followed in most areas of the law, the burden of proof as to

5   causation in CERCLA cases lies with the defendant. The plaintiff must prove only that

6   contaminants which were once in the custody of the defendant could have traveled onto the

7   plaintiff's land, and that the subsequent contaminants (chemically similar to the contaminants

8   once in the defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs.

9   The plaintiff need not produce any evidence that the contaminants did flow onto his land from

10   defendant's land.  Rather, once plaintiff has proven a *prima facie* case, the burden falls on the

11   defendant to *disprove causation.*"  *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F.

12   Supplemental. 2d 1053, 1065 (C.D.Cal. 2003)(italics in original), quoting *Westfarm Associates*

13   *Limited Partnership v. Washington Sanitary Comm'n,* 66 F.3d 669, 681 (4th Cir. 1995).  Accord:

14   *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 264-66 (3d Cir. 1992)(plaintiffs in a

15   "multi-generator" case cannot be required to prove causation and connect response costs to each

16   responsible party); *Kalamazoo River Study Group v. Menasha Corp.,* 228 F. 3d 648, 658 (6th Cir.

17   2000); *United States v. Stringfellow,* 661 F. Supp. 1053, 1060-61 (C.D.Cal. 1987)(causation was

18   deleted from the statute; plaintiffs do not have to prove causation); *Church v. General Electric*

19   *Co.,* 138 F. Supp.2d 169, 178 (D.Mass. 2001)(to overcome Rule 56 inquiry in common law

20   nuisance case, plaintiff need not "date and time-stamp each PCB molecule released" onto

21   plaintiff's land; circumstantial evidence of ongoing seepage sufficient).

22        Plaintiff has met its burden of proof by showing that PCBs are present in the soil and

23   groundwater at the site.

24            **5.**     **Plaintiff Has Incurred Necessary Costs in Response Consistent with**
                   **the National Oil and Hazardous Substances Pollution Contingency**

25                    **Plan ("NCP")**

26        CERCLA Section 107(a)(2)(B) allows recovery of "costs of response," which includes

27   costs incurred "to monitor, assess, and evaluate the release or threat of release of hazardous

28   substances," and costs of actions "necessary to prevent . . . damage to the public health . . .

16

1  [including] security fencing or other measures to limit access." See CERCLA § 101(23), 42

2  U.S.C. § 9601(23).  *Cadillac Fairview v. Dow Chem. Co.*, 840 F.2d 691 (9th Cir. 1988).

3      The release of PCBs at the site have caused Plaintiff to incur response costs that were

4  "necessary" and "consistent with the national contingency plan." The National Contingency Plan

5  is promulgated by the United States Environmental Protection Agency pursuant to CERCLA. 42

6  U.S.C. § 9605. Regulations are set forth as 40 C.F.R. Part 300, *et seq.*

7          (a)     Plaintiff's Costs Are Necessary Costs in Response

8      The Regional Water Quality Control Board has oversight over this site. Plaintiff's

9  activities have been necessary to investigate and respond to the PCB contamination at the site,

10 and Plaintiff has directed that all such activities be consistent with the NCP with the intention of

11 recovering response costs. See the accompanying Declaration of Peggy Peischl.

12     "In determining whether response costs are 'necessary,' we focus not on whether a party

13 has a business or other motive in cleaning up the property, but on whether the response action is

14 a threat to human health or the environment and whether the response action is addressed to that

15 threat." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001).

16     As shown by the environmental investigation reports of AmecGeomatrix , TYCO

17 THERMAL has incurred the costs of investigation and monitoring to respond to the risks of

18 PCBs which are hazardous substances. See the accompanying Declaration of Peggy Peischl in

19 support of this motion. Plaintiff has undertaken to assess and evaluate the release of hazardous

20 substances at the site, is working with the Water Board to do so, and has acted consistently with

21 the requirements of the NCP to propose alternative remediation methods and select a preferred

22 method with community involvement. In addition, TYCO THERMAL has taken action

23 necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the

24 environment, including installation of security fencing to limit access to the site, and conducted a

25 a health assessment of the building interior. See the accompanying Declaration of Margaret K.

26 Peischl in support of this motion.

27 ///

28

1

          (b)     Plaintiff's Necessary Costs of Response Actions Were Incurred
                    Consistent with the NCP.

2

3
      For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA: "A private

4
party response action will be considered "consistent with the NCP" if the action, when evaluated

5
as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and

6
(6) of this section, and results in a CERCLA-quality clean-up; ..."[11]

7
      A summary of the response actions and the corresponding costs are set forth as follows:

| Date | Invoice No.[12] | Description from Invoice | Amount |
|---|---|---|---|
| 10/17/07 | AMEC Geomatrix Invoice 0057721 | Technical consultation, coordination of dust suppression work and project management tasks. | $2,770.63 |
| 12/20/07 | AMEC Geomatrix Invoice 0059477 | Review and summarize existing chemical analytical data for use in draft site investigation work plan; perform data gap analysis; prepare draft figures; start preparation of draft site investigation work plan; and project management tasks as needed. | $7,384.26 |
| 02/21/08 | AMEC Geomatrix Invoice 0061088 | Complete first draft site investigation work plan; attend meeting to discuss first draft site investigation work plan; provide technical consultation; prepare second draft and distribute for review; prepare final site investigation work plan and project management tasks as needed. | $22,464.01 |
| 03/04/08 | AMEC Geomatrix Invoice 0061418 | Provide technical consultation re: site investigation and Regional Water Quality Control Board approval; prepare draft and final scopes of work and cost estimates for site investigation; and perform project management tasks as needed. | $4,475.90 |
| 04/24/09 | AMEC Geomatrix Invoice 0062927 | Conduct site investigation including mobilization, soil borings, groundwater monitoring wells, groundwater sampling, and surveying; review preliminary chemical analytical data; and perform project management tasks as needed. | $30,086.94 |

11.    40 C.F.R. § 300.700(c)(3)(i)

12.    These AMEC Geomatrix invoices are attached to the Declaration of Margaret K. Peischl as Exhibit G.

18

| 05/19/08 | AMEC Geomatrix Invoice 0063408 | Obtain samples of investigation-derived waste and submit to laboratory for chemical analyses; prepare draft site investigation report; and perform project management tasks as needed. Subcontractor portion of this invoice: RSI Drilling Invoice 03-80046 for Direct Push Technology/Hollow Stem Auger, 3/12/08–3/18/08; 3/21/08 in the amount of $17,390.00. | $46,475.39 |
| --- | --- | --- | --- |
| 06/19/08 | AMEC Geomatrix Invoice 0064210 | Review and validate chemical analytical results for samples of investigation-derived waste; prepare final site investigation report; and perform project management tasks as needed. Subcontractor portion of this invoice: (1) Nolte Beyond Engineering Invoice 809089 for revision of record boundary 04/11/08–05/08/08 in the amount of $528.00; (2) Nolte Beyond Engineering Invoice 8070608 for field and office surveying and mapping for property line research and layout; locating soil bore hole and monitoring well locations and providing survey results in GeoTracker format, 02/15/08–03/27/08 in the amount of $8,650.00; (3) Curtis & Tompkins, Ltd. Analytical Laboratories Invoice 198711 for laboratory analyses 03/25/08 in the amount of $5,820.00; (4) Curtis & Tompkins, Ltd. Analytical Laboratories Invoice198732 for laboratory analyses 03/25/08 in the amount of $5,702.00; (5) Curtis & Tompkins, Ltd. Analytical Laboratories Invoice 198734 for laboratory analyses 03/25/08 in the amount of $9,669.00; (5) Curtis & Tompkins, Ltd. Analytical Laboratories Invoice 198926 for laboratory analyses 04/02/08 in the amount of $4,102.00; Curtis & Tompkins, Ltd. Analytical Laboratories Invoice 199019 for laboratory analyses 04/08/08 in the amount of $3,905.00; (6) Curtis & Tompkins, Ltd. Analytical Invoice 199027 for laboratory analyses 04/08/08 in the amount of $20.00; (7) Curtis & Tompkins, Ltd. Analytical Invoice 199382 for laboratory analyses 04/23/08 in the amount of $666.00; and (8) Federal Express Invoice 2-453-72846 shipping charges of $53.00. | $46,207.61 |
| 08/21/08 | AMEC Geomatrix Invoice 0065964 (revised) | Review and validate chemical analytical results for samples of investigation-derived waste; prepare final site investigation report; and perform project management tasks as needed. Subcontractor portion of this invoice: Subsurface Locating Services Invoice SLS856 for site set up and equipment calibration and locating utility services 03/11/08 in the amount of $375.00. | $1,809.73 |
| 09/17/08 | AMEC Geomatrix Invoice 0066561 | Provide technical consultation re: scope and estimated costs for feasability study and remediation scenarios; complete soil and groundwater investigation task, including final report; and perform project management tasks as needed. | $3,307.72 |

19

| 10/17/08 | AMEC Geomatrix Invoice 0067502 | Provide technical consultation re: scope and estimated costs for feasability studies and remediation scenarios; and perform project management tasks as needed. | $4,763.72 |
|---|---|---|---|
| 11/25/08 | AMEC Geomatrix Invoice 0068397 | Upload site investigation report to GeoTracker website; prepare draft Groundwater Monitoring Program Work Plan; start preparation of draft RI/FS; and perform project management tasks as needed. | $11,006.84 |
| 12/15/08 | AMEC Geomatrix Invoice 0068987 | Continue preparation of draft RI/FS; perform mobilization tasks for quarterly groundwater monitoring program; and perform project management tasks as needed. | $24,770.04 |
| 01/19/09 | AMEC Geomatrix Invoice 0069908 | Complete draft and final RI/FS; perform oversight of quarterly groundwater monitoring sampling and start preparation of draft groundwater monitoring program report; and perform project management tasks as needed. | $25,094.69 |
| 02/13/09 | AMEC Geomatrix Invoice 0070556 | Prepare for and attend meeting at Regional Water Quality Control Board to present RI/FS findings, discuss Water Board's review process, and outline future regulatory requirements; prepare draft and final groundwater monitoring program report; and perform project management tasks as needed. Subcontractor portion of this invoice: Curt & Tompkins, Ltd., Analytical Laboratories Invoice 205292 for laboratory analyses 12/23/08 in the amount of $2,462.00; Environmental Sampling Services Invoice 1057 dated 1/16/09 for quarterly groundwater monitoring tasks in the amount of $1,557.58 and Federal Express Invoice 9-031-36293 for shipping costs in the amount of $128.68. | $8,818.06 |
| 03/17/09 | AMEC Geomatrix Invoice 0071519 | Perform mobilization tasks for first quarter 2009 groundwater sampling event; and perform perform project management tasks as needed. Subcontractor portion of this invoice: Federal Express Invoice 9-096-46761 for shipping costs in the amount of $36.10. | $1,458.41 |
| 04/23/09 | AMEC Geomatrix Invoice 0072537 | Prepare draft report for first quarter 2009 groundwater sampling event; prepare draft figures and revise human health risk assessment description for public participation Fact Sheet; and perform project management tasks as needed. Subcontractor portion of this invoice: Curtis & Tompkins, Ltd. Analytical Laboratories Invoice 206887 for laboratory analyses 3/2/09 in the amount of $1,735.00; and Federal Express Invoice 9-112-78678 for shipping costs in the amount of $20.14. | $7,567.78 |

20

| 05/28/09 | AMEC Geomatrix Invoice 0073342 | Complete draft report for first quarter 2009 groundwater sampling event; prepare figures and revise text for public participation Fact Sheet required by Regional Water Quality Control Board; start preparation of Remedial Action Plan required by the Water Board; and perform project management tasks as needed. Subcontractor portion of this invoice: Environmental Sampling Services Invoice 1073 for quarterly groundwater monitoring 2/23/09 in the amount of $1,303.44. | $10,241.20 |
| 06/23/09 | AMEC Geomatrix Invoice 0074021 | Review Human Health Risk Assessment, evaluate data with respect to Property. 65, and prepare draft memorandum to summarize results; complete final report for first quarter 2009 groundwater sampling event; complete draft Remedial Action Plan; perform regulatory agency file review for 955 Charter Street site; and perform project management tasks as needed. Subcontractor portion of this invoice: Federal Express Invoice 9-185-90637 for shipping costs in the amount of $14.03; Golden State Overnight Invoice for shipping costs 5/6/09 in the amount of $6.91; and Environmental Health San Mateo County for file review in the amount of $50.00. | $12,280.00 |
| 07/30/09 | AMEC Geomatrix Invoice 0075011 | Review laboratory data and prepare draft tables and figures for the second quarter 2009 groundwater sampling event; review draft Water Board Fact Sheet and prepare Spanish translation for Mara Feeney; coordinate distribution of draft Remedial Action Plan; and perform project management tasks as needed. Subcontractor portion of this invoice: Golden State Overnight Invoice for shipping costs 6/9/09 in the amount of $13.85. | $5,030.70 |
| 08/27/09 | AMEC Geomatrix Invoice 0075800 | Prepare final second quarter 2009 groundwater monitoring report; prepare materials and slide presentation for public meeting; attend and present at Water Board meeting; and perform project management tasks as needed. Subcontractor portion of this invoice: Environmental Sampling Services Invoice 1099 for quarterly groundwater monitoring 5/26/09 in the amount of $1,292.16. | $8,686.51 |
| | | TOTAL | $284,700.94 |

"Preliminary" or "initial" investigative costs may be recovered even if the plaintiff did

not comply with the NCP. *Krygoski Const. Co., Inc., v. City of Menominee,* 431 F.Supp.2d 755,

762 (W.D. Mich. 2006), citing *Pierson Sand & Gravel, Inc., v. Pierson Township,* 89 F.3d 835

1  (6th Cir. 1996). See also *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.

2  1986), ruling that "testing expenses" are recoverable as "response costs."

3              (c)      Plaintiff Has Provided an Opportunity for Public Comment

4         Plaintiff has provided the public with information[13] and has acted in consultation with a

5  Community Relations consultant. See the accompanying Declaration of Mara Feeney in support

6  of this motion.

7         Plaintiff has interviewed to the extent practicable local officials, community residents,

8  and other interested or potentially affected parties to learn their concerns.[14]  Plaintiff's consultant

9  has also prepared a formal community relations plan to ensure an opportunity for public

10  involvement, and at least one local "information repository" has been established to make

11  information available to the public about site remediation.[15] See the accompanying Declaration

12  of Mara Feeney in support of this motion.

13         In compliance with 40 C.F.R. § 300.430(f)(3) Plaintiff published a notice of the preferred

14  remediation plan in a major local newspaper of general circulation; made the proposed plan and

15  supporting analysis available; provided a reasonable opportunity for submission of written and

16  oral comments; gave notice of and provided the opportunity for a public meeting on July 22,

17  2009 during the public comment period on the proposed plan and the supporting analysis and

18  information located in the information repository and made an audio recording of the meeting

19  which is available to the public (as there were no public comments at the meeting, no transcript

20  or written summary of comments, criticisms, or new information was made). A true and correct

21  copy of the Community Meeting Notice is attached as Exhibit D to the accompanying

22  Declaration of Mara Feeney in support of this motion.

23

24  13.     Plaintiff has provided "Notification of Site Cleanup Oversight" dated April 2009 to nearby
25  landowners and residents/occupants as well as other interested persons which describes the site background,
    past work to investigate and clean up site contamination, next steps, the Water Board's oversight process for
26  the site, and how more information can be obtained.

27  14.     40 C.F.R. § 300.430(c)(2)(i).

28  15.     40 C.F.R. § 300.430(c)(2)(ii).

**6.     Defendant Rowe Has No Defense.**

CERCLA's basic liability provision provides strict liability subject only to the defenses set forth in subsection 9607(b)[16]. Defendant ROWE has no evidence to support any of the possible defenses. The release of PCBs occurred not by an act of God or an act of war. The release of PCBs was not *caused solely* by an act or omission of a third party. There being no evidence of any defense, Defendant ROWE cannot establish any defense.

**B.     DEFENDANT ROWE IS LIABLE UNDER HSAA**

HSAA is interpreted consistently with CERCLA. *KFC Western, Inc. v. Meghrig*, 23 Cal.App.4th 1167, 1174-77 (1994). Elements to be shown are the same under CERCLA and HSAA. *Nixon-Egli Equipment Co. v. John A. Alexander Co.*, 949 F. Supp. 1435, 1441 n. 4 (C.D.Cal.1996).

California Health & Safety Code § 25363(e) states as follows:

"Any person who has incurred removal or remedial action costs in accordance with this chapter or the federal act may seek contribution or indemnity from any person who is liable pursuant to this chapter... In resolving claims for contribution or indemnity, the court may allocate costs among liable parties using those equitable factors which are appropriate."

---

16.    There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--

    (1)    an act of God;
    (2)    an act of war;
    (3)    an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual   arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
    (4)    any combination of the foregoing paragraphs.

---

23

1    Plaintiff has been required to perform investigation of environmental contamination of

2    the property and has incurred the costs of hiring an environmental consultant for investigation,

3    and Plaintiff will incur costs of remediation of the PCB contamination.  PCBs are hazardous

4    substances as defined by § 25316.  Plaintiff has incurred response costs in accordance with

5    CERCLA and is entitled to seek recovery of such costs from ROWE as set forth above.

6    Defendant ROWE likewise has no defense to this claim and is liable as shown under the

7    CERCLA analysis above.

8    **IV.    CONCLUSION**

9    As set forth above, Plaintiff is entitled to a summary adjudication of Defendant ROWE'S

10   liability under CERCLA and HSAA for response costs which Plaintiff has incurred to date for

11   Plaintiff's responses to the contamination of the site in the amount of $284,700.94.  Plaintiff will

12   seek recovery of additional costs it will expend to investigate or remediate the contaminated

13   site.[17]

14

15   Dated: October __, 2009          STANZLER FUNDERBURK & CASTELLON LLP

16

17                                    By:_____

18                                          Jordan S. Stanzler

19                                    Attorneys for Plaintiff TYCO THERMAL CONTROLS, LLC

20

21

22

23

24

25

26

27   _____

28   17. There are other "response costs" that Plaintiff may seek recovery for in the future, in addition to
     the AMEC Geomatrix bills.

**PLAINTIFF TYCO THERMAL CONTROLS, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

1  **PROOF OF SERVICE**
   [C.C.P. § 1013, C.R.C.§ 2008, F.R.C.P. Rule 5]

2

3            I, Sharran L. Rodd, state:

4            I am a citizen of the United States.  My business address is 2275 E. Bayshore
   Rd., Suite 100, Palo Alto, CA 94303.  I am employed in the City of Palo Alto and County of
   Santa Clara where this mailing occurs.  I am over the age of eighteen years and not a party to

5  this action.  On the date set forth below, I served the foregoing document described as:

6  **PLAINTIFF TYCO THERMAL CONTROLS, LLC'S NOTICE OF MOTION AND
   MOTION FOR SUMMARY ADJUDICATION; CONCISE STATEMENT;**

7  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**

8  on the following person(s) in this action as follows:

9  Margaret R. Dollbaum, Esq.
   Nathaniel Wood, Esq.

10 Folger Levin & Kahn LLP
   Embarcadero Center West

11 275 Battery Street, 23rd Floor
   San Francisco, CA 94111

12

   Glenn Friedman, Esq.

13 Paul Desrochers, Esq.
   Lewis Brisbois Bisgaard & Smith LLP

14 One Sansome Street, Suite 1400
   San Francisco, CA 94104

15

   Mordecai D. Boone, Esq.

16 Quang H. Dang, Esq.
   Gordon & Rees

17 275 Embarcadero Center West
   Suite 2000

18 San Francisco, CA 94111

19 :        BY FIRST CLASS MAIL - I am readily familiar with my firm's practice for collection
            and processing of correspondence for mailing with the United States Postal Service, to-

20          wit, that correspondence will be deposited with the United States Postal Service this
            same day in the ordinary course of business.  I sealed said envelope and placed it for

21          collection and mailing this date, following ordinary business practices.

22 X :      Filed and served electronically in accordance with the Court's electronic filing
            ("ECF") rules, pursuant to which registered ECF users receive service copies by e-

23          mail delivery.- I caused said document to be transmitted by Facsimile machine to the
            number indicated after the address(es) noted above.  A courtesy copy will follow by

24          Fed Ex.

25          I hereby certify that I am employed in the office of a member of the Bar of this Court
   at whose direction the service was made, and I certify under penalty of perjury that the

26 foregoing is true and correct.

27 Dated: October 26, 2009

28                                                    Sharran L. Rodd