1
2
3
4
5
6
7           UNITED STATES DISTRICT COURT

8          NORTHERN DISTRICT OF CALIFORNIA

9            SAN FRANCISCO DIVISION

10

11  PENTAIR THERMAL MANAGEMENT,          Case No. 06-cv-07164 NC
    LLC, formerly known as TYCO THERMAL    Case No. 10-cv-01606 NC
12  CONTROLS, LLC,
                                         **FINDINGS OF FACT AND**
13        Plaintiff and Counter-defendant,    **CONCLUSIONS OF LAW AFTER**
                                         **BENCH TRIAL**
14        v.

15  ROWE INDUSTRIES, INC.,

16        Defendant and Counter-claimant.

17

18        This case arises from a $7.2 million cleanup of polychlorinated biphenyl (PCB)

19  contamination at an industrial property in Redwood City, California.  It is undisputed that

20  the soil and facilities at 2201 Bay Road were polluted with PCBs, a chemical known to

21  cause cancer.  The trial pitted Pentair, the current owner of the site, against Rowe, the

22  successor to an operator of an electrical transformer manufacturing business at the site.[1]

23  Two central questions are presented.  First, whether Rowe, or someone else, should be

24  responsible for environmental remediation of the contamination.  Second, if Rowe is liable,

25  whether Tyco's remediation costs were both necessary and compliant with the National

26

27  _____
    [1] On January 30, 2013, the parties stipulated that Tyco Thermal Controls, LLC's name be amended
28  to Pentair Thermal Management, LLC, formerly known as Tyco Thermal Controls, LLC.  Dkt. No.
    534.  For the purposes of this order, Pentair Thermal Management, LLC will be referred to as Tyco.

    Case Nos. 06-cv-07164 NC, 10-cv-01606 NC
    FINDINGS OF FACT AND
    CONCLUSIONS OF LAW

1  Contingency Plan (NCP).  Before trial, Tyco reduced the amount of money it was seeking

2  for its completed cleanup to approximately $3.9 million.  The Court finds that Tyco

3  established at trial that Rowe is responsible for the PCB contamination at the site and that

4  Tyco's reduced costs were both necessary and compliant.

## I. BACKGROUND

**A.    Judges**

This case has seen many judges.  When Tyco filed its complaint in November of 2006

the case was assigned to Judge Jeremy Fogel.  Dkt. No. 2.[2]  In September 2011, the case

was reassigned to Judge Saundra Brown Armstrong.  Dkt. No. 347.  Then, in July 2012, the

parties consented to the jurisdiction of this Court, and the case was transferred for trial.

Dkt. Nos. 437, 438.

**B.    Parties and the Complaints**

On November 17, 2006, Tyco filed Case No. 06-cv-07164 against defendants

Redwood Industrials, Roland Lampert, Audrey Lampert, Laverne E. Doolittle, Deceased;

Emile K. Doolittle, Deceased; Masha Lampert, Deceased; Morris M. Grupp, Deceased; and

Anna M. Grupp, Deceased (collectively, Redwood); Carlisle Companies, Inc.; Carlisle

Corporation and Tensolite Company, sued erroneously as Tensolite Insulated Wire Pacific

Division, Inc.; and Tensolite Insulated Wire Company, (collectively, Carlisle); and

Coleman Cable & Wire Company, Pacific Transformer Company, Hill Magnetics, Inc.,

and Hill Industries, Inc.  Dkt. No. 1.  The initial complaint sought recovery of costs

associated with investigation and cleanup, contribution, and declaratory relief under the

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as

amended by the Superfund Amendments and Reauthorization Act of 1986 (CERCLA), 42

U.S.C. § 9601; the Resources Conservation and Recovery Act (RCRA), 42 U.S.C.

§§ 6901-6972; the Declaratory Relief Act, 28 U.S.C. § 2201; and California state law.  *Id.*

//

---

[2] Unless otherwise indicated, all docket references are to the docket in Case No. 06-cv-07164.

On January 15, 2007, Tyco filed a first amended complaint adding Rowe as a defendant and alleging eight claims for relief including: (1) recovery of response costs under CERCLA, 42 U.S.C. § 9607(a); (2) contribution under CERCLA § 113(f), 42 U.S.C. § 9613(f)(1); (3) relief under RCRA, 42 U.S.C. §§ 6901- 6972; (4) declaratory relief under federal law; (5) response costs under the Hazardous Substance Account Act (HSAA), Cal. Health & Safety Code § 25300, *et seq.*; (6) comparative equitable indemnity under state law; (7) declaratory relief under state law; and (8) attorney's fees under Cal. Civ. P. § 1021.5. Dkt. No. 4.

Rowe brought a counter-claim against Tyco on April 2, 2007, in which it alleged that Tyco is a responsible party under CERCLA, 42 U.S.C. § 9607. Dkt. No. 19 at 24. Rowe sought a declaration of Tyco's liability for present and future costs, and in the event that Rowe was found liable, contribution from Tyco, under CERCLA, 42 U.S.C. § 9613. *Id.* at 24-25. Rowe also claimed that because any liability assigned to it would arise merely because of the actions of its predecessors-in-interest and not from any actively negligent or culpable conduct on its part, that it was entitled to equitable indemnification or contribution from Tyco. *Id.* at 26.

On October 29, 2009, Tyco moved for leave to file a second amended complaint, to add claims against Rowe under California law for continuing nuisance and continuing trespass, and to dismiss voluntarily and without prejudice its RCRA claim in order to comply with RCRA's pre-litigation notice requirement. Dkt. No. 82. On December 14, 2009, the Court granted Tyco's motion to withdraw the RCRA claim without prejudice, but denied its request to add additional claims. Dkt. No. 101. Tyco's first amended complaint, absent the RCRA claim, remained the operative pleading. *Id.* On March 2, 2010, Tyco again moved to amend its pleading to allege a RCRA claim against Rowe. Dkt. No. 164. The Court denied that motion, concluding that the proposed amendment would not cure Tyco's failure to comply with RCRA's jurisdictional notice requirement. Dkt. No. 180.

On April 14, 2010, Tyco filed Case No. 10-cv-01606, alleging a RCRA claim against Rowe. On May 4, 2010, the Court related Case No. 06-7164 and Case No. 10-cv-01606.

Dkt. No. 185.  Rowe moved to dismiss, and the Court granted Rowe's motion, but allowed Tyco leave to amend.  Dkt. No. 233.  Subsequently, the Court granted Rowe's motion for summary judgment, and denied Tyco relief under RCRA.  Dkt. No. 344.

**C.   Redwood and Carlisle Settlements**

In January 2010, Redwood and Carlisle settled with Tyco for $275,000 and $150,000, respectively.  Joint Pre-Trial Conference Statement at 8, Dkt. No. 391.  In August 2010, the Court granted the motions for approval of settlement.  Dkt. No. 233.  In his order granting the motions for approval of settlement, Judge Fogel expressly determined that any liability for Tyco's CERCLA claims would be allocated under the proportionate share method set forth in the Uniform Comparative Fault Act (UCFA), rather than the pro tanto, or dollar-for-dollar, approach.  Dkt. No. 233 at 11.

**D.   Rulings on Evidence**

   **1.     July 9, 2012 Order on Motions in Limine**

In anticipation of trial before Judge Armstrong, the parties filed numerous motions in limine.  On July 9, 2012, the Court denied Tyco's motion in limine to exclude evidence of the unsigned release agreement between settling defendant Redwood Industrials and Rowe's predecessor, Coleman Cable & Wire Company.  Dkt. No. 434.  In so ruling, the Court "d[id] not relieve Rowe of its obligation to establish a proper foundation for the admission of the Release Agreement at trial," nor "deprive Tyco of its right to object to such evidence."  *Id.* at 6.  The Court denied Tyco's motion in limine to preclude Rowe from calling two expert witnesses, Gabriel Sabadell, Ph.D., and Richard Richter, Ph.D., P.E., to testify about their opinions that the PCB contamination was caused by railroad activities on the site.  *Id.*  The Court denied Rowe's motion in limine to exclude records showing shipments from Monsanto to Hill.  *Id.*  Finally, the Court granted Rowe's motion in limine to exclude Tyco's undisclosed expert witnesses, Carmen Santos and Steve Armann, both employed by the EPA, as well as Leonard Long of SCS Engineers, and George Reid of GRE & Associates, because Tyco had failed to disclose them as experts in accordance with Federal Rule of Civil Procedure 26(a)(2).  *See* Dkt. No. 428.

1

2

3

4

5

6

7

8

9

10

11

12

### 2.     September 28, 2012 Order on Motions in Limine

After the case was reassigned, the parties brought additional motions in limine and Rowe moved to strike one of Tyco's proposed trial witnesses. Tyco untimely disclosed trial witness, Mara Feeney, and the Court granted Rowe's motion to strike.  Dkt. No. 480. Ruling on the motions in limine, the Court: (1) denied Rowe's motion to exclude all evidence of Tyco's damages related to the demolition and removal of the building; (2) denied Rowe's motion to admit the Redwood-Coleman release into evidence without calling the authenticating witness to testify; (3) granted Tyco's motion to exclude evidence that Rowe is not the successor-in-interest to the Hill Magnetics, Hill Industries, and Pacific Transformer entities; and (4) denied Tyco's motion to exclude evidence that liability for harm caused by Hill Magnetics could be apportioned to non-party Energy Systems, Inc. *See* Dkt. No. 482.

13

14

15

16

17

18

19

20

21

In order to admit the Redwood-Coleman release, the Court found that Rowe must establish a proper foundation for its admission and that Tyco must be given the opportunity to cross-examine the authenticating witness, Marshall Small, Senior Counsel with Morrison & Foerster, in order to develop the factual record regarding the release.  *Id.* at 8-9.  As to Rowe's status as successor-in-interest, the Court found that Judge Fogel's previous ruling that "Rowe is the successor-in-interest to Coleman and in turn the successor-in-interest to Hill Industries, Hill Magnetics, and Pacific Transformer" precluded Rowe from introducing contrary evidence at trial.  Dkt. No. 482 at 10 (citing Dkt. No. 180 at 2 n.2).

22

### 3.     Exclusion of Evidence at Trial

23

24

25

26

27

At trial, Rowe moved to admit the unsigned release agreement between Redwood and Coleman, under which Rowe argued that Redwood agreed to indemnify it for any claims for damages arising out of its use of the Property.  *See* Dkt. No. 391. at 18.  Tyco objected to its admission and objected to the designated deposition testimony of Marshall Small as hearsay and as lacking personal knowledge.  Dkt. No. 529; Tr. 1209:15-16.

28

//

That the release is unsigned does not render it inadmissible, but the Court ruled that Rowe had failed to authenticate the release through the deposition testimony of Small or otherwise. Tr. 1184:16-20, 1213:4-7. The Court had explicitly required that Small testify in person to authenticate the release and allow Tyco the opportunity to cross-examine in order to develop a factual record about the release. Tr. 1187:22-1188:3. Despite this order, Rowe did not produce Small as a witness at trial. Tr. 1212:20-25. The Court sustained Tyco's hearsay objections, Tr. 1213:8-17, and excluded the release under Federal Rule of Evidence 901(b) for failure to authenticate the document. Tr. 1213:4-7, 1218:8-12.

**E.    Trial**

This Court held an eight-day bench trial from January 22, 2013 through January 31, 2013. Tyco seeks to recover costs it incurred cleaning up PCBs at the site where Rowe's predecessors had manufactured PCB-containing electrical transformers between 1966 and 1970. Rowe contends that the PCB contamination originated from other sources, including Tyco's manufacturing of 44 Wire, railroad operations, and paint in the building.

**F.    Post-Trial Briefing**

After the close of evidence, the Court permitted the parties to submit additional briefing regarding (1) amendments to their proposed findings of fact and conclusions of law based on the evidence presented at trial, (2) apportionment and contribution, (3) prejudgment interest, and (4) Rowe's motion for judgment on partial findings. *See* Tr. 1538:5-20, 1539:21-23. The parties filed their initial briefs on these matters on February 15, 2013 and their oppositions on February 22, 2013. *See* Dkt. Nos. 544, 545, 546, 547, 549, 550, 551.

### 1.    Rowe's motion to strike

Rowe moved to strike Tyco's post-trial proposed findings of fact and conclusions of law, or in the alternative to be permitted further briefing, arguing that they amounted to a "closing argument brief." Dkt. No. 548. The Court denied Rowe's motion, finding that Tyco's submission was in accordance with Court orders, and that Rowe failed to show good cause for filing its motion. Dkt. No. 552.

### 2.    Tyco's request for judicial notice

In its opposition to Rowe's Rule 52(c) motion, Tyco requests judicial notice of an excerpt of a guide published by the United States Environmental Protection Agency (EPA) entitled "Guide to Preparing Superfund Proposed Plans, Records of Decision, and Other Remedy Selection Decision Documents."  Dkt. No. 550 at 12; Levine Decl. ¶ 2-3, Dkt. No. 550-1.  Rowe objects to Tyco's request under Federal Rule of Evidence 403, asserting that admittance of the EPA records would be prejudicial to Rowe as no notice of the document was provided until Tyco submitted the document in a post-trial brief.  Dkt. No. 555 at 2.  Rowe further asserts that the evidence is cumulative, hearsay, and not properly authenticated. *Id.*

Federal Rule of Evidence 201 provides in pertinent part: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the trail court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Rowe's objection on the basis of prejudice does not suggest that the authenticity of the EPA guidelines is in any way in dispute. *See* Dkt. No. 555.  Moreover, judicial notice may be taken at any stage of a proceeding, including during and after trial. Fed. R. Evid. 201(d).  Accordingly, the Court takes judicial notice of the EPA guide under Federal Rule of Evidence 201.

## II. STANDARD OF REVIEW

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).

## III. FINDINGS OF FACT

### A.    History of the Site Ownership and Tenancy

The site, located near the intersection of Highway 101 and Woodside Road in Redwood City, California, was developed in the 1950s and presently consists of approximately 2.12 acres, an asphalt parking lot, a loading dock, and an unpaved roadway behind the building. Dkt. No. 391 at 7; *see* Ex. 204 at TTC 22769 (showing extent of PCB

//

contamination requiring remediation after supplemental soil sampling); Ex. 121A (showing facility use during Hill Magnetics' operations at the site) (attached).

Redwood purchased the site in 1955. *Id.* From approximately 1955 to 1962 Redwood leased the site to Sequoia Process Corporation. *Id.* From approximately November 1962 to 1973, Redwood leased the site to Tensolite Insulated Pacific Division, Inc. (predecessor to Carlisle). *Id.* On June 23, 1965, Tensolite subleased the site to Hill Industries, Inc., which later changed its name to Hill Magnetics, Inc. Ex. 3. Coleman Cable & Wire Company, Rowe's predecessor, purchased Hill Magnetics, Inc. in 1968. Dkt. No. 391 at 7. Shortly thereafter, Coleman Cable & Wire changed the name of Hill Magnetics to Pacific Transformer. *Id.* The Court found, and Rowe later stipulated, that Rowe Industries, Inc. is the successor-in-interest to Coleman Cable & Wire Co., Hill Industries, Inc., Hill Magnetics, Inc., and Pacific Transformer. Dkt. 180; Dkt. No. 391 at 8. On March 28, 1973, Raychem Corporation purchased the site. Ex. 5. Tyco purchased Raychem in 1999. Tr. at 652:2-3.

**B.    Site Operations**

**1.    Hill**

Hill subleased the site on or about June 23, 1965. Ex. 3. Hill Magnetics was engaged in the manufacture of electrical transformers prior to mid-1966 or early 1967. Ex. 815 (Potter Depo.), 13:15-25. In mid-1966 or early 1967, Orin Potter was put in charge of running the facility, which he ran until May 1968, when he ceased working for Hill. Ex. 815 at 15:4-15. When Potter began working at Hill, the company employed twenty-seven people. Ex. 815 at 14:9-13, 128:15-16.

Prior to Potter joining Hill Magnetics, the company had been run by Max Hill. Ex. 815 at 14:9-13, 128:15-16. Max Hill's operations at the site were observed by Potter to be not "clean," and he was known to be a "schlock operator." Ex. 815 at 14:9-13, 128:15-16. When Potter started at Hill Magnetics, he barred Max Hill from working on the facility floor. Ex. 815 at 54:25-56:9.

//

1

### a.   Hill products and operations

2   Potter worked to expand Hill's electrical transformer manufacturing business.  To

3   facilitate this goal, he created a brand known as "Pacific Transformer" to be used by Hill in

4   marketing electrical transformers.  Ex. 815 at 18:4-19:20.  Hill manufactured various types

5   of transformers at the site during Potter's tenure there, including transformers that utilized

6   Askarels.  Ex. 815 at 21:5-22:13.  Askarels are a brand name of a type of PCB fluid

7   manufactured during that time period by Monsanto.  Tr. 217:23-218:4.  The Askarels

8   utilized by Hill were known by Potter to have PCBs and to have been manufactured by

9   Monsanto.  Ex. 815 at 21:5-22:13.  In January 1968, Hill advertised itself as selling

10  "Askarel" transformers.  Ex. 116.  It further promoted itself as being "one of the West's

11  largest transformer manufacturing facilities."  Ex. 116.

12  During Potter's employment, Hill employees assembled Askarel transformers at the

13  site.  Ex. 815 at 49:9-50:8.  The top of the transformer would be removed, and Askarels

14  would be hand-pumped from 55 gallon drums into the top of the tank.  Ex. 815 at 49:9-50:8.

15  Depending on the size of the transformers, sometimes Hill employees would use several 55

16  gallon drums to fill a single transformer.  Ex. 815 at 49:9-50:8.  After filling the transformer

17  tank, the Askarels were vacuumed to remove moisture.  Ex. 815 at 47:4-49:11.  During the

18  vacuuming process, liquid from the vacuuming would be collected in a bucket, which

19  would be poured down a drain at the facility.  *Id.*  The exhaust from the vacuuming process

20  would be vented directly from the Askarel filled transformers openly into the facility.  *Id.*

21  The manufacture of the transformers, including the filling of the tank and the vacuuming,

22  occurred near the center back of the facility.  Ex. 815 at 37:15-39:23.  The location of these

23  operations is more specifically identified by an "X" drawn on a diagram of the facility by

24  Potter.  Ex. 121A; Ex. 815 at 37:15-39:23.

25  During Potter's time at Hill, PCBs and Askarels were not known by Hill employees to

26  be dangerous.  Ex. 815 at 22:3-13.  The Askarels appeared to be "crystal-clear water."  Ex.

27  815 at 22:3-13.  On occasion, Hill employees, including  Potter, would roll up their sleeves

28  and place their bare arms up to their elbows into the Askarel liquids in the transformers to

perform adjustments to the transformers. Ex. 815 at 22:3-24:20. The workers would then dry their arms with rags and throw the rags away. Ex. 815 at 22:3-24:20.

Potter left Hill in May 1968. As of that time, Hill's operations had grown to 127 employees. Ex. 815 at 123:18-25. Hill continued to manufacture electrical transformers until sometime in late 1970, when it ceased its operations. (Deposition of James Herring (Dkt. 395-2), 10:3-7, 17-23, 17-23-18:12, 28:15-30:24); Ex. 118; Ex. 4; Ex. 523 at 0000001-0000002, 0000092; Ex. 8; Ex. 516.

### b.    Hill's use of PCBs

Records from Monsanto show that it sold large amounts of PCB fluids to Hill between 1965 and 1970. *See generally*, Ex. 6; Tr. 66:24-89:1. Monsanto sold PCB fluids under the trade name "Askarels." Tr. 217:23-218:4. Askarels are a mixture of PCBs and tricholorobenzenes ("TCBs"). Tr. 218:8-19. Askarels were also marketed under the trade names "Interteen" and "Pyranol." Tr. 218:23-24.

A Monsanto "Sales Summary" from December 1965 indicates that 10,000 pounds of "Trans. Pyranol" was sold to Hill Magnetics. Ex. 6 at B-27; Tr. 83:1-13. Another Monsanto Sales Summary from December 1966 indicates that 5,400 pounds of "Transformer Pyranol" was sold to Hill Magnetics. Ex. 6 at B-28; Tr. 83:14-84:6. But, this same document indicates that "sales last year" of Pyranol to Hill totaled 4,050 pounds. Ex. 6 at B-28; Tr. 84:3-6. Sales summaries indicate that Monsanto sold approximately 46,000 pounds of "Trans. Pyranol" to Hill in 1967. Ex. 6 at B-32 (1968 sales record indicating "total sales last year" were 45,585); Tr. 85:13-86:3; *see also* Ex. 6 at B-29 (showing 1967 sales month-by-month of Pyranol totaling to 46,000 pounds of Trans Pyranol sold)); Tr. 84:7-84:25.

Records from 1968 indicate that Monsanto sold 226,000 pounds of "Bulk Transformer Askarels" to Hill Magnetics, located in Redwood City, California, Ex. 6 at B-1; Tr. 81:2-10, which was comprised of 55,268 pounds of Interteen PPO, Ex. 6 at B-30; Tr. 85:1-1, 150,748 pounds of Interteen 70-30, Ex. 6 at B-31; Tr. 85:12-18, and 19, 935 pounds of Pyranol, Ex. 6 at B-32; Tr. 85:19-86:3. "Customer Sales Reports" from 1969 indicate

that Monsanto sold 97,800 pounds of Askarels to Pacific Transformers in Redwood City; 48,800 pounds of Interteen PPO in February and 49,000 pounds of Interteen 70-30 in November.  Ex. 6 at B-33, B-34, B-36; Tr. 86:5-25.  A customer sales report dated December 1970 indicates that Monsanto sold 49,700 pounds of Interteen 70-30 to Pacific Transformers in Redwood City, California.  Ex. 6 at B-36; Tr. 87:1-25.

A record from June 4, 1968 indicates that Monsanto shipped 43,810 pounds of Interteen PPO, in 65 drums, to Hill Magnetics at 2201 Bay Road, Redwood City, California.  Ex. 6 at B-9; Tr. 71:9-72:21.  Another record from 1970 indicates that Monsanto sent 100,000 pounds of Interteen 70-30 to Pacific Transformers in Redwood City, California by tank car.  Ex. 6 at B-22; Tr. 77:14-79:13.  A record from February of 1970 indicates that Monsanto made a shipment by tank car to Pacific Transformers at 2201 Bay Road, Redwood City, California.  Ex. 6 at B-23; Tr. 88:19-89:17.

The Askarels Hill purchased from Monsanto contained Aroclor 1254 and 1260.  Tr. 241:15-25.  Aroclor 1254 and 1260 were detected in the soil at the site, Tr. 242:9-11, in paint inside building, Tr. 243:6-8, in the concrete in the building, Tr. 243:9-10, and in the walls, ceiling, and rafters of the building.  Tr. 243:20- 244: 2.

Dielectric fluids used in the manufacture of electrical transformers are the only type of PCB-containing fluid that includes TCBs.  Tr. 694:25-695:7.  Contaminated soil samples from the site revealed that where PCBs were detected, so were TCBs.  Tr. 695:11-18.

                    **c.**     **Spills during the manufacture of transformers**

Potter placed an "X" on a diagram of the facility showing where Hill's Askarel transformer manufacturing operations primarily took place.  Ex. 121A.  The highest detection of PCBs within the facility—a paint sample which registered 141,000 mg/kg and a concrete sample, which registered 9000 mg/kg—closely correspond with the "X" drawn by Potter.  *Compare* Ex. 513, figure 1 *with* Ex. 121A; *see also* Tr. 437:6-440:13.  Samples detecting high levels of contamination in the concrete at the facility were concentrated in the center of the facility towards the back and overlapped with Potter's location of Hill's operations.  *Compare* Ex. 204, Fig. 7 *with* Ex. 121A; *see also* Tr. 442:1-20.

In PCB transformer manufacturing operations, it is typical that some material would be released to the facility. Tr. 245:23-247:8. Rowe's expert witness, Gabriel Sabadell, Ph.D., testified that half of a coffee cup of Askarels spilled on the ground could result in contamination findings of a thousand milligrams per kilogram. Tr. 1120:21-1121:1. A few drops on the ground could result in contamination in the hundreds. Tr. 1121:2-6.

Tyco's expert, Eric Butler, Ph.D., was accepted as expert on forensic analysis of PCB contamination. Tr. 692:1-2. Butler performed a survey on PCB-fluid transformer manufacturing facilities nationwide. Tr. 698:2-701:7. Of the thirteen transformer facilities for which he could obtain information, all thirteen were associated with PCB contamination. Tr. 701:12-20. Butler concluded that the PCB contamination at the site was most likely associated with PCB transformer making. Tr. 694:7-13.

Tyco's expert, Thomas Delfino, was accepted as an expert in chemistry and for opinions as to causation and investigation that are within the field of his expertise. Tr. 210:24-15. Delfino concluded that there is a connection between the types of Askarels used by Hill and the PCB detections in the facility, and that the handling, storage, and use of Askarels by Hill resulted in the release of PCBs. Tr. 245:23-247:8, 363:20-22.

### d.    Hill's use of the railroad

The highest concentrations of PCBs in the soil are north of the building and concentrated behind the railroad-loading ramp. Tr. 237:9-238:2; Ex. 204 at TTC 22767. Monsanto records establish that in 1970, Monsanto shipped at least 100,000 pounds of liquid PCBs to Hill by tank car. Ex. 6 at B-22; Tr. 38:25-40:25. Hill promoted itself in 1968 as offering customers "railroad siding convenience," which confirms its use of the railroad. Ex. 116.

### 2.    Raychem

Raychem purchased the site on or about March 28, 1973. Ex. 5. Raychem did not operate at the site prior to the acquisition. (Deposition of Paul Cook (Dkt. 454) at 54:16-20). Paul Cook testified in his deposition that, at the time that Raychem acquired the site, he was its president and CEO and that he did not know the site had been used for electrical

1  transformer manufactures, that any hazardous substances had been used on the property, or

2  that PCBs specifically had been used in manufacturing operations there.  Dkt. No. 454 at

3  63:4-8, 64:5-9, 65:8-18.  But, Cook also testified that he became aware of the health hazards

4  of PCBs in the 1960s, and that, as president, he would evaluate written reports on potential

5  property acquisitions prepared by Raychem's facilities team.  Dkt. No. 515-1 at 32:19-25,

6  37:10-21.  These reports were broad and were likely to include the previous use and

7  operations, if any, of the potential acquisition.  Dkt. No. 515-1 at 35:23-36:13.  At least

8  once when acquiring a property, Raychem conducted soil tests for hazardous materials and

9  to evaluate the stability of the ground in the event of an earthquake.  Dkt. No. 515-1 at 39:8-

10  21.  Thus, it may be inferred that Raychem was likely to have known that transformers were

11  manufactured on the site and that PCBs were involved in that process.

12          **a.**     **Raychem's products**

13       Raychem manufactured at the site a PCB-containing product known as "44 Wire" for

14  approximately three years between 1973 and 1976.  Tr. 543:7-16, 567:10-20, 568:11-16,

15  1138:21-24, 1139:9-12.  Raychem operated its 44 Wire production process twenty-four

16  hours per day, five to seven days per week.  Tr. 546:25-547:17, 568:17-569:7.

17       The process of making 44 Wire involved melting solid plastic pellets, which

18  contained Viscol, a PCB-containing substitute for Monsanto's Aroclor 1254.  Tr. 235:2-

19  254:4, 535:15-23, 540:2-22, 560:11-561:9, 1144:24-1146:1.  During the extrusion process,

20  bleed scrap would fall on the ground, and water from cooling troughs into which the 44

21  Wire was submerged would spill; the bleed scrap as well as the mops and rags used to clean

22  up water spills would be thrown into the garbage at the site.  Tr. 545:20-546:9, 562:18-21,

23  563:8-567:5, 1152:6-1153:10, 1154:11-1156:15.  The 44 Wire was extruded near the back

24  of the building, near the loading dock.  Exs. 711A, 711B.  The location of the extrusion

25  process aligns with the contaminated location inside the building.  *Compare* Ex. 204 *with*

26  Exs. 711A, 711B.

27  //

28

The pellets were manufactured in Menlo Park, California, Tr. 536:23-537:6, but Raychem stored thousands of pounds of pellets at the site. Tr. 543:7-16, 567:10-20, 568:11-16, 1138:21-24, 1139:9-12.

### b.   Raychem's use of the railroad

Stephen Andrus, who owns property adjacent to the site, Dkt. No. 546 at 13 n.2, testified that, in the late 1970s, he observed plastic pellets being delivered to Raychem by rail car and off-loaded at the loading dock. Tr. 1235:8-1236:16. Plastic pellets were found in the ground, in the right-of-way, behind the property. Tr. 975:12-16; 1118:11-14.

### 3.   Other potential sources of contamination

### a.   Railroad operations

PCB contamination around railroads is primarily associated with electrical commuter trains, which used PCB-containing electrical transformers to power their cars. Tr. 703:3-24. PCBs are also associated with hydraulic braking fluids and air brake systems, both of which have been used in trains. Tr. 1029:2-8. Waste oil and herbicides may also contain PCBs and can be associated with railroads. Tr. 1028:14-19.

No evidence was admitted that the railroad operations near the site involved electrical commuter trains or rails. Tr. 704:11-705:14. No evidence was admitted that any railroad used PCBs in the rail spur behind the site, or of what equipment was used by a railroad, or how PCBs are or were released by a railroad. Tr. 1046:22-1047:11.

### b.   Flooding

Heavy rains have been known to flood the railroad easement and loading dock. Ex. 807. The area next to the building, along the railroad tracks, would frequently flood during winter storms. Ex. 808. Portions of the building would also often be flooded. *Id.* Samples taken from the sub-slab, as well as the slab, showed water migration. Tr. 1110:25-1112:18.

### c.   Paint

Aroclor 1254 and 1260 were detected in paint inside the building. Tr. 243:6-8. The highest detected concentration of PCB contamination within the facility was 141,000 mg/kg in the paint. Tr. 437:6-440:13. Monsanto manufactured 99 percent of the PCBs used in

paints.  Tr. 1045:16-19.  Monsanto stopped selling paint containing PCBs in 1971.  Tr. 259:23-260:4.  Tyco's predecessor painted the building on the site.  Tr. 1101:2-16, 1105:1-1106:4.  As of 1973, the floor was not painted.  Tr. 534:13-24, 555:14-16.

### 4.    Tyco's response to contamination

#### a.    Time of response

In August 2004, Earth Tech, Inc. prepared a Phase I Environmental Site Assessment of the site on behalf of Tyco which recommended further assessment based on the industrial history of the site.  Ex. 505.  In June 2005, Earth Tech prepared a Phase II Environmental Site Assessment of the site for Tyco, at which time PCB contamination above EPA screening levels was at the site.  Ex. 175.

#### b.    Regulatory interactions

On or about July 22, 2006, Tyco submitted a Request for Oversight of a Brownfield site to the Regional Water Quality Control Board (the "Water Board") requesting that the agency take oversight of the assessment and remediation of the site.  Ex. 188.  On or about October 4, 2007, the Water Board sent a letter to Tyco requiring the submission of a technical report.  Ex. 527.  On or about December 2007, Tyco, through Margaret Peischl, submitted a site Investigation Work Plan which proposed additional investigation to the Water Board.   Ex. 15; Tr. 384:19-385:16.

After submitting the work plan, Tyco undertook further sampling as described in the work plan.  Tr. 385:17-20.  The further investigation revealed that there were PCBs in soil of about five feet to eight feet in depth that exceeded the acceptable levels for total PCBs. Tr. 387:2-9.  Peischl concluded that PCB concentrations were sufficient to warrant further evaluation and recommended that a formal evaluation be made as to remedial options for the site, and that a groundwater sampling plan be conducted.  Tr. 387:10-17.  On or about April 30, 2008, Peischl submitted a site investigation report to the Water Board showing the results of the investigation work, along with recommendations for further work.  Ex. 502; Tr. 386:2-13, 388:5-11.

//

On August 8, 2008, the Water Board concurred with the recommendations and asked that a feasibility study and groundwater sampling plan be prepared. Ex. 85; Tr. 388:13-389:12. Peischl submitted the groundwater monitoring plan as requested on October 30, 2008, and it was approved. Exs. 70, 86; Tr. 390:10-391:2.

Peischl also prepared a feasibility study as requested by the Water Board. Tr. 392:12-14, 394:3-4; Ex. 14. Peischl weighed three remedial alternatives in preparing the study. Tr. 394:5-14; Ex. 14 at 10723-27. She evaluated the following alternatives: no action, surface capping, and excavation. Tr. 394:25-395:4. She determined that taking no action was not appropriate because there was PCB contamination above screening levels at the site. Tr. 395:9-20. She recommended the use of alternative three—excavation—as it removed the contaminants from the site and was protective of human health and the environment. Tr. 396:10-13. Peischl submitted the feasibility study to the Water Board on December 15, 2008. Ex. 14; Tr. 396:20-23. On January 28, 2009, the Water Board approved the feasibility study and required Tyco to submit a remedial action work plan. Ex. 83; Tr. 397:2-398:3.

### c. Public participation

In April 2009, Peischl prepared an approved fact sheet that notified the public of site cleanup oversight. The document was approved by the Water Board and circulated to the public. Ex. 200; Tr. 399:21-400:12.

Peischl prepared a draft remedial action plan and submitted it to the Water Board on May 29, 2009. Ex. 17; Tr. 403:15-24. In the remedial action plan, Peischl evaluated the various alternatives for the site: no action, capping, excavation, and concluded that excavation was the preferred alternative. Tr. 403:25-404:24. Peischl concluded that excavation was preferred to capping as it limited the risk due to the need for continued monitoring and maintenance. Tr. 404:23-405:14; Ex. 14 at 24, Item 4.3. In making her determination, she also considered that regulators and the public generally favored source removal. Tr. 405:18-407:14, 407:16-408:1; Ex. 14 at 23, Items 4.2.8, 4.2.9. The remedial action plan proposed excavation boundaries, but specifically contemplated that further

testing would be done in order to delineate the exact boundaries. Tr. 408:21-409:18; Ex. 14 at 23-24.

In June 2009, Peischl prepared a second public notice, which was approved by the Water Board and circulated to the public, providing notice of a July 22, 2009 public meeting regarding the remedial action plan. Tr. 410:3-16; Ex. 522. On July 22, 2009, a public meeting was held to discuss the remedial action plan. Tr. 411:11-13; Ex. 145.

On July 31, 2009, Rowe submitted a report to the Water Board objecting to the remedial action plan, and advocating that a cap remedy be used instead of an excavation remedy. Ex. 530. In response the Water Board stated that there was "uncertainty" in carrying out the long term monitoring and tracking activity that would have been required at the site if capping were used. Tr. 527:9-528:8; Ex. 531. No member of the public who was not a defendant to this litigation has objected to the proposed remedy of excavating the contamination and removing it from the community. Tr. 525:25-526:3, 590:13-16.

On September 15, 2009, Peischl prepared a cost addendum to the feasibility study. Ex. 18; Tr. 414:3-20. The addendum estimated the comparative costs of excavation and capping to be within the same order of magnitude. Ex. 18 at 3; Tr. 415:8-416:7.

On October 6, 2009, the Water Board approved the remedial action plan and required Tyco to submit a remedial design/remedial action work plan for the selected remedy. Tr. 416:10-23; Tr. Ex. 503. Peischl prepared the requested remedial design/remedial action work plan and submitted it to the Water Board on November 30, 2009. Ex. 22; Tr. 417:13-25. The Water Board approved the remedial design/action plan on January 20, 2010. Ex. 90; Tr. 418:10-419:10.

Tyco performed further testing as called for in the pre-excavation sampling plan set forth in the remedial design/remedial action work plan. Ex. 90 at Appx. C; Tr. 419:15-420:11. The subsequent testing revealed PCBs in additional areas at the site, which led to a recommended increase in the areas to be excavated. Ex. 13 at Fig. 4, Fig. 6; Tr. 422:12-423:5.

//

Tyco met with EPA representatives regarding the site in May 2010.  Tr. 428:5-16.  As requested by the EPA, Peischl prepared a PCB Clean Up Notification and Work Plan in June 14, 2010.  Ex. 75; Tr. 429:2-13.  On October 5, 2010, Peischl prepared an addendum to the PCB Clean Up Notification and Work Plan responding to follow-up questions from the EPA.  Ex. 77; Tr. 430:1-431:1.

On December 14, 2010, Spence Leslie, Tyco's Director of International Trade Compliance and internal project leader for this site cleanup, circulated a written update to neighbors on the status of the project.  Ex. 219; Tr. 593:5-20.

On January 4, 2011, the EPA provided a conditional approval of the work plan, contingent on the preparation of an additional sampling and analysis plan.  Ex. 27 (Conditions of Approval, Section C(2)); Tr. 431:10-18.  In February 2011, Peischl prepared the sampling and analysis plan as requested by the EPA.  This involved additional sampling and investigation beyond what had previously been performed.  Ex. 42; Tr. 432:8-20.

On August 5, 2011, Leslie circulated another written update to neighbors of the status of the project.  Ex. 147; Tr. 598:11-599:3.

On January 26, 2012, the EPA conditionally approved the sampling and analysis plan. Ex. 53; Tr. 433:2-15.  Tyco submitted an addendum to the sampling and analysis plan on February 9, 2012, making modifications as requested by the EPA.  Ex. 244; Tr. 434:3-19).

In May 2012, Tyco circulated a public notice, which was approved by the Water Board, updating the community on the remediation.  Ex. 259; Tr. 436:5-17.  The notice was also circulated, along with another status update, to neighbors by Leslie.  Tr. 602:23-603:10; Ex. 157.

As additional PCB contamination was discovered during the investigation process, an expanded excavation area was proposed.  Ex. 204, Fig. 9; Tr. 442:22-443:10.  Peischl submitted a Supplemental Site Investigation report on May 4, 2012.  Ex. 204; Tr. 440:14-24.  On May 24, 2012, the EPA approved a proposed barrier design aspect of the project. Ex. 258.  In the summer of 2012, Tyco performed the excavation as described in the

//

1  remedial action plan as modified by the increased excavation area described in the

2  Supplemental Site Investigation Report.  Tr. 455:5-456:4.

3         Two amendments were made to the project as it was described in the remedial action

4  plan and Supplemental Site Investigation Plan.  Both amendments were made with the

5  participation and approval of the EPA.  Tr. 605:11-606:2; Ex. 271 (EPA approval of

6  Amendment #1); Tr. 606:20-607:21; Ex. 277 (EPA approval of Amendment #2)).  The first

7  amendment was required because PCB contamination was along the northern boundary,

8  found at 8 feet below the surface where groundwater is present.  Tr. 459:1-8.  Tyco

9  completed the excavation at that depth and backfilled the excavation as planned; however, it

10 restricted the use of the footprint of this area, and labeled it a "multimedia cap."  Tr. 459:8-

11 12; Ex. 298 at TTC 36426.  The second amendment was in an area along a different

12 property boundary where PCB concentration was found at 8 feet, but where Tyco was

13 unable to excavate as an adjacent building stood right up to the property boundary.  Tr.

14 459:23-460:19.  To address the infeasibility of excavating this precise location, Tyco

15 similarly "capped" the area.  Tr. 460:8-19; Ex. 298 at TTC 36426.

16        After the remediation was performed, a remedial action completion report was

17 submitted to the EPA and the Water Board.  Ex. 287; Tr. 462:15-462:10.  In November

18 2012, the Water Board issued an Explanation of Significant Differences that discussed the

19 amendments to the plan.  Tyco circulated it to the public.  Tr. 462:17-463:16; Ex. 295.

20 Tyco has recorded a restrictive covenant on the property due to the contamination.  Tr.

21 613:14-614:8.  The EPA has advised that it would review the remedial action completion

22 report and respond.  Tr. 612:14-613:8; Ex. 294.  It has not yet confirmed that it will not

23 require further remediation.  Tr. 613:14-614:8.

## IV. CONCLUSIONS OF LAW

### A.    The Court Denies Rowe's Rule 52(c) Motion.

26        At the close of evidence, Rowe moved for judgment on partial findings under Federal

27 Rule of Civil Procedure 52(c).  Dkt. No. 544.  Specifically, Rowe argued that Tyco's

28 remediation of the site did not meet the requirements of CERCLA, which necessitated

Case Nos. 06-cv-07164 NC, 10-cv-01606 NC
FINDINGS OF FACT AND                                    19
CONCLUSIONS OF LAW

1   finding Rowe not liable for any portion of the remediation process.  Dkt. No. 544 at 8.

2   Rowe argued that Tyco's two amendments to the final selected remedy were fundamental

3   changes to the remediation plan, which required public comment, and by failing to comply

4   with this procedural requirement, Tyco's remediation was not CERCLA-quality.  Dkt. No.

5   544 at 9.  Rowe also argued that Tyco's method of remediation—specifically excavation—

6   was not cost-effective, and thus neither NCP-compliant nor CERCLA-quality.  Dkt. No.

7   544 at 12.  Rowe contends that because the total price-tag for the remediation was $7.2

8   million, but only $3.9 million was NCP-compliant according to Tyco's expert, that the

9   process was not cost-effective.  Dkt. No. 544 at 15.

10      Judgment on partial findings should be granted only where a party has been fully

11  heard on an issue that is dispositive to the success of its claim or defense, and the court has

12  found against it.  *Id.*  The court may enter judgment on partial findings "at any time that it

13  can appropriately make a dispositive finding of fact on the evidence."  Fed. R. Civ. P. 52(c)

14  (advisory committee notes on 1991 amendment).

15      In moving for judgment on partial findings, Rowe argues that Tyco is not entitled to

16  have inferences drawn in its favor, as would be the case under Federal Rule of Civil

17  Procedure 50.  The Court agrees. "In deciding whether to enter judgment on partial findings

18  under Rule 52(c), the district court is not required to draw any inferences in favor of the

19  non-moving party; rather, the district court may make findings in accordance with its own

20  view of the evidence." *Ritchie v. United States*, 451 F.3d 1019, 1022-23 (9th Cir. 2006).

21  "[T]he standard for entering judgment as a matter of law differs" from the standard for

22  entering judgment under Rule 52(c)." *Id.* at 1023 n.7.

23      Having made the findings of fact described in detail above regarding the

24  effectiveness, cost, and quality of Tyco's remediation, the Court declines to enter judgment

25  in favor of Rowe under Rule 52(c).  Rather, as described in detail below, the Court

26  concludes that Rowe is liable and that Tyco's remediation is NCP-compliant.

27  //

28

**B.      Rowe Is Liable Under CERCLA for Tyco's NCP-Compliant Response Costs.**

In order for a private party to recover cleanup costs under 42 U.S.C. § 9607(a), the plaintiff must make a prima facie showing that (1) the property at issue is a "facility" as defined in 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of a "hazardous substance" has occurred; (3) the "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the [NCP]"; and (4) the defendants are in one of four classes of persons subject to liability under § 9607(a). *Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006).

The first two elements are uncontested.  First, the site is a facility, as defined by CERCLA.  42 U.S.C. § 9601(9) (defining a facility as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located").  Courts have interpreted the term facility broadly; "in order to show that an area is a facility, the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there." *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1360 n.10 (9th Cir. 1990) (internal citations and quotation marks omitted) (collecting cases).

Second, there was a release of a hazardous substance.  A "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).  Both Tyco and Rowe have put forth evidence that PCBs were found in and around the building at 2201 Bay Road.  Significant PCB contamination has been found throughout the building and the site, in the soil, the ceiling, rafters, walls, and concrete slab. *See, e.g.*, Exs. 53, 204.  PCBs are a "hazardous substance."  40 C.F.R. § 302.4; *see* 42 U.S.C. § 9601(14)(B).  Tyco has satisfied the first and second elements to recover response costs under CERCLA.

//

1    The Court therefore turns to whether (1) Tyco incurred costs necessary and consistent

2    with the NCP, [3] and (2) whether Rowe is one of the classes of persons subject to liability

3    under 42 U.S.C. § 9607(a).

4    **1.      Tyco's response actions complied with the NCP.**

5    Tyco has demonstrated that it incurred costs for investigating, characterizing, and

6    remediating the site, which total $3,970,126.  In order to recover these costs under

7    CERCLA, Tyco must show that they are necessary and consistent with the NCP.  42 U.S.C.

8    § 9607(a)(3)(B); *Carson Harbor*, 433 F.3d at 1265 ("Private parties have the burden of

9    proving that cleanup costs associated with remedial actions are consistent with the National

10   Contingency Plan to recover those cleanup costs under CERCLA.").

11   **a.      Tyco's response actions were necessary.**

12   Costs are "necessary" under the NCP when the remedy is cost-effective and the

13   response cost is tied to the actual cleanup of hazardous releases.  40 C.F.R.

14   § 300.430(f)(1)(ii)(D); *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005)

15   ("[R]ecognized costs cannot be deemed 'necessary' to the containment and cleanup of

16   hazardous releases absent some nexus between the alleged response cost and an actual

17   effort to respond to environmental contamination.") (collecting cases).

18   **i.      Tyco's response actions were cost-effective.**

19   A remedial action is "cost-effective if its costs are proportional to its overall

20   effectiveness."  40 C.F.R. § 300.430(f)(1)(ii)(D).  Overall effectiveness is measured by

21   evaluating the "long-term effectiveness and permanence, reduction of toxicity, mobility, or

22   volume through treatment, and short-term effectiveness" of the remedy.  *Id.*  The cost-

23   effectiveness of a remedy is evaluated when the remedy is selected.  40 C.F.R.

24   § 300.430(f)(1)(ii)(D).

25

26   [3] Although Rowe argues that the "cause" of the costs incurred was for business advantage, the
plaintiff's motive for cleaning up the property is irrelevant as long as there was a threat to human

27   health and safety, and the response action addresses that threat.  *Carson Harbor*, 270 F.3d at 872.
The Court addresses Rowe's contentions regarding Tyco's motives in more depth when considering

28   equitable factors in Part IV.D.

"By requiring a cost-effective response, the [NCP] does not mandate the cheapest possible response. Instead, courts have held that more expensive options were cost-effective when the added expense bought additional environmental benefit." *AmeriPride Servs., Inc. v. Valley Indus. Serv., Inc.*, Case No. S-00-cv-113 LKK (JF), 2011 WL 1833179, *16 (E.D. Cal. May 12, 2011) (citing *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 546 (6th Cir. 2001)). For example, the Sixth Circuit examined the cost-effectiveness of a party's plan to remove contamination from a landfill and to encapsulate any remainder that could not be excavated. *Franklin Cnty.*, 240 F.3d at 546. Capping alone would have been less expensive than the chosen method of excavating the contaminated area. *Id.* Nevertheless, the Sixth Circuit concluded that the higher cost was "insignificant when compared to the benefits . . . achieved in terms of permanence and reduction of mobility and volume to remove as much of the contamination as possible" and determined that the remediation was cost-effective. *Id.*

When considering which remedy to select, Tyco initially projected that the cost of excavation would be $2.6 million and the cost of capping would be $1.7 million. Ex. 18 at 3, Tr. 415:6-416:7. In choosing to excavate the PCB contamination from the site, Tyco considered that the "primary concern at the site was to remove the contaminants from the site" and that the costs for both remedies were of "the same order of magnitude." Tr. 416:2-4. The Water Board found that excavation would "provide[] a permanent remedy for the site" and "eliminate[] the potential for exposures to PCB's at the site." Tr. 528:2-4, 527:17-18. Conversely, a cap would require "leaving the contamination in place," "permanent monitoring of the site, tracking land use at the site, and ensuring that any future activities at the site do not result in exposure to the underlying contamination." Tr. 527:19-25.

Given CERCLA's policy goals of effecting permanent environmental cleanups and encouraging private parties to undertake remedial work, the Court places great weight on the long-term effectiveness and reduction of toxicity factors. Tyco chose a permanent remedial option, which, necessarily, has a long-term effect and significantly reduces the toxicity of the environment. Just as in *Franklin County*, the benefit of Tyco's plan is that it

1   removed as much contamination as possible, which contributed to the permanence of the

2   remediation and a reduction in the mobility and volume of the contamination.

3   Furthermore, because CERCLA mandates that the cost-effectiveness of the remedy

4   must be evaluated when it is selected, the fact that the cost of excavating the site eventually

5   exceeded Tyco's initial estimate does not factor into the Court's analysis of proportionality.

6   40 C.F.R. § 300.430(f)(1)(ii)(D) ("Each remedial action *selected* shall be cost-effective.")

7   (emphasis added); *United States v. Kramer*, 913 F. Supp. 848, 867 (D.N.J. 1995) (finding

8   that the NCP requires evaluation of the cost-effectiveness of competing remedies, but the

9   NCP does not require that the actual items of response cost be cost-effective).  When the

10  costs of excavation are weighed against the benefits of the remedy, the Court finds the costs

11  proportional.  Therefore, Tyco's remedy is cost-effective.

12              **ii.      Tyco's response costs were closely tied to cleanup of the site.**

13  "[C]osts cannot be deemed necessary to the containment and cleanup of hazardous

14  releases absent some nexus between the alleged response cost and an actual effort to

15  respond to environmental contamination."  *Young*, 394 F.3d at 863.  Circuit courts have

16  generally concluded that "a response cost is only necessary if the cost is closely tied to the

17  actual cleanup of hazardous releases."  *Id.* (emphasis in original); *Ellis v. Gallatin Steel Co.*,

18  390 F.3d 461, 482, 2004 WL 2382166, *17 (6th Cir. Oct. 26, 2004) (explaining only work

19  that is "closely tied" to the actual cleanup of contaminated property may constitute a

20  necessary response cost); *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d

21  275, 297 (3d Cir. 2000) (holding response costs were not necessary because they did not

22  pertain to a remedial or removal action on the contaminated property); *Gussack Realty Co.*

23  *v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) (explaining a necessary cost of response

24  must be incurred in remedying a site); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669-70

25  (5th Cir. 1989) (explaining that "[t]o justifiably incur response costs, one necessarily must

26  have acted to contain a release threatening the public health or the environment.").

27  *Sealy Connecticut, Inc. v. Litton Indus., Inc.* presents an illustrative example, with

28  facts almost identical to the case at hand.  93 F. Supp. 2d 177 (D. Conn. 2000).  In *Sealy*,

the plaintiffs purchased a manufacturing facility that had contamination on the site and beneath the concrete floor. *Id.* at 181. Plaintiff had decided to demolish the building prior to examining other feasible alternatives. *Id.* at 185. Because the demolition was not necessary to remediate the property, the costs associated with the demolition were excluded from recovery. *Id.* at 188-89. Plaintiff did recover, however, the costs it incurred to "remove the underground storage tanks that furthered the remediation effort." *Id.* at 189.

Here, Tyco has already reduced the costs it seeks to recover from Rowe to what it spent cleaning up the contamination. The reduction from $7.2 million to $3.9 million reflects a deduction of costs that were deemed unnecessary or unrelated to the cleanup effort, as determined by Tyco's expert, Stephen Johnson. *See* Ex. 298. Johnson testified as an NCP compliance expert and provided evidence at trial of the method used for determining if a cost is necessary. He reviewed a total of $7,215,542 in costs incurred by Tyco, and excluded a total of $3,245,416 in costs as not being necessary response costs, including approximately $700,000 in litigation costs, approximately $2.3 million in building demolition and hazardous substance abatement, and $370,000 in non-remedial demolition of asphalt. Tr. 798:17-799:7. He concluded that Tyco incurred a total of $3,970,126 in costs that related to excavating the site and treating groundwater. Tr. 830:14-16; Ex. 298.[4] Finding the witness credible and the method consistent with the case law, the Court finds that Johnson has correctly identified and included only necessary costs that are closely tied to the actual cleanup efforts in his calculation of Tyco's response cost of $3,970,126.

Rowe suggested in its briefs and at trial that the Court should look to the entire cost of the project and find that Tyco has not complied with the NCP requirements because only about 55% of the entire costs were NCP-compliant. This argument is unpersuasive for two reasons. First, CERCLA only allows for recovery of response costs that are necessary and compliant with the NCP. 42 U.S.C. § 9607(a)(4)(B). As discussed above, the requirement

---

[4] Johnson also opined that Tyco incurred $55,906 in pre-judgment interest calculated from the date of the filing of the initial complaint in this matter. Tr. 830:17-831:13; Ex. 298. The Court addresses Tyco's claim for prejudgment interest in Part IV.F.

that the remediation be consistent with the NCP as a whole refers only to those recoverable (i.e., necessary) costs, and thus the Court need only analyze those costs that fall within the criteria described in the NCP. Second, courts routinely exclude those costs that are not necessary from their analysis, and then determine if the remaining response costs were also consisted with the NCP and thus recoverable. *See, e.g.*, *Washington State Dept. of Transp. v. Washington Natural Gas Co., Pacificorp*, 59 F.3d 793, 802 (9th Cir. 1995) (finding district court's failure to review a percentage of the total response costs for NCP compliance harmless error because it was inconsistent with the NCP).

### b.    Tyco's response actions were consistent with the NCP.

Costs are "'consistent with the NCP' if the action, when evaluated as a whole, is in "substantial compliance" with the procedures outlined therein and "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). A CERCLA-quality cleanup is one that substantially complies with the NCP. *Franklin Cnty.*, 240 F.3d at 543. The NCP imposes three main procedural requirements: (1) opportunity for public comment and participation, (2) a remedial site investigation, and (3) the preparation of a feasibility study. 40 C.F.R. § 300.700(c)(5)(vii)-(viii), (c)(6). Only the first is at issue.

In interpreting the "as a whole" and "substantial compliance" provisions, courts have noted that, in 1990, the EPA changed this language from the former, stricter standard. This change was meant to create a more flexible standard in order to encourage private parties to clean up hazardous sites without fear of failing to meet all of the NCP criteria. 55 Fed. Reg. 8666-01, 8792-94; *Waste Mgmt. of Alameda Cnty., Inc. v. East Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1100 (N.D. Cal. 2001). Evaluating a remedial action as a whole reflects CERCLA's preference for a holistic rather than "a checklist approach," because the latter could "'defeat cost recovery for meritorious cleanup actions based on a mere technical failure by the private party.'" *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1160 (C.D. Cal. 2003) *aff'd sub nom. Carson Harbor Vill., Ltd. v. Cnty. of Los Angeles*, 433 F.3d 1260 (9th Cir. 2006) (quoting 55 Fed. Reg. 8666-01, 8793).

//

i.     **The public participated in developing the remedial plan.**

Public participation in a remedial action requires two procedures.  First, in developing a remedial action plan before fieldwork begins, the party shall interview local officials, community residents, or other interested or affected parties to learn their concerns. 40 C.F.R. § 300.430(c)(2).  The party must also prepare formal community relations plans and establish at least one local "information repository."  40 C.F.R. § 300.430(c)(2)(ii). Second, after a remediation plan is chosen, the party must publish a notice of the plan in a local newspaper, provide an opportunity for submission of comments on the proposed plan, provide an opportunity for a public meeting, make a transcript of the meeting available to the public, and prepare a written summary of significant comments and responses to those comments.  40 C.F.R. § 300.430(f)(3).

Tyco has satisfied the two main procedural requirements for public participation. First, it sough the assistance of local community officials, namely the Water Board, to assess and remediate the site.  Second, Tyco notified the public and held a hearing regarding its plans for the site.  In April 2009, Tyco prepared a fact sheet about the cleanup of the site, which the Water Board approved and circulated to the public.  After a preferred remediation plan had been selected, Tyco sent a second public notice, which was also approved by the Water Board, and which provided notice of the July 22, 2009 meeting regarding the chosen remedial action.  On July 22, 2009, a public meeting was held to discuss Tyco's remedial action plan.  The draft remediation plan thus became the "record of decision," which described Tyco's plan for cleaning up the site.  Ex. 17; Tr. 411:11-13; Ex. 145; 40 C.F.R. § 300.430(f)(5)(ii) (Once a remedy has been selected, "all facts, analyses of facts, and site-specific policy determinations considered in the course of carrying out activities in this section shall be documented, as appropriate, in a record of decision.").

In addition, Tyco took additional steps throughout the remediation process, to ensure that the public was kept up-to-date.  It sent status updates to neighbors of the site in December 2010, August 2011, and May 2012.  Tyco sent a public notice, approved by the Water Board, updating the entire community on the remediation of the site in May 2012.

1  Yet, Tyco made two amendments to its remediation plan in August and September of 2012.

2  Exs. 271, 277.  These amendments were sent to the EPA and the Water Board, Exs. 268,

3  271, 275, 277; however, the public did not have an opportunity to comment on the

4  amendments.  Instead, in November 2012, after the remediation was complete, Tyco

5  circulated to the public the Water Board's Explanation of Significant Differences, which

6  discussed the changes to the plan that had occurred during the cleanup.

7                    **ii.    Tyco alerted the public to changes in the remedial action.**

8         Significant changes to the remedy after the record of decision has been made must be

9  explained and publicized.  42 U.S.C. § 9617(c), (d).  The NCP preamble, 55 Fed. Reg.

10  8666-01, 8772, is the guideline used by the EPA to determine what level of public comment

11  is required for changes to a record of decision.  "Significant changes" are those that have a

12  significant effect on the scope, performance, or cost of the preferred remediation method

13  and require public notice through an Explanation of Significant Differences.  40 C.F.R.

14  § 300.435(c)(2)(i); *see also* "Guide to Addressing Pre-ROD and Post-ROD Changes, EPA,

15  Office of Solid Waste and Emergency Response," Publication: 9355.3-02FS-04 (April

16  1991).  Examples of a significant change include "when sampling during the remedial

17  design phase indicates the need to increase the volume of waste material to be removed" or

18  when new a technology or method is chosen to achieve the objective of the remedial plan,

19  such as treating contaminated groundwater by carbon adsorption instead of air stripping.

20  55 Fed. Reg. 8666-01, 8772.  A "fundamental change" to the performance, scope, or cost of

21  the remediation requires an amendment to the plan and renewed public participation.

22  40 C.F.R. § 300.435(c)(2)(ii).

23         Few cases have delineated the distinctions between a significant and a fundamental

24  change.  Courts that have addressed the issue have focused on the definitions of

25  "fundamental" and "basic"; describing a fundamental change as "so drastic that the essence

26  of the remedy—its basic features— . . . the very core or definition of what the remedy is"

27  has been changed.  *United States v. NCR Corp.*, Case No. 10-cv-910, 2012 WL 5879106, *5

28  //

1  (E.D. Wis. Nov 21, 2012) (finding a sixty-two percent increase in remediation costs not a

2  fundamental change, but a significant change).

3      In *In re Atlantic Richfield Co.*, 8 E.A.D. 394 (1999), the Environmental Appeals

4  Board of the Environmental Protection Agency explicitly rejected a "numerical standard,"

5  based on an increase in the volume of hazardous waste to be removed, for distinguishing a

6  fundamental change from a significant change to a remedial plan.  1999 WL 504706, *16.

7  Instead, the Board determined that the characterization of a change as significant or

8  fundamental is "site-specific" and noted that it was "particularly disinclined" to characterize

9  a change as fundamental "with the benefit of hindsight" "where no request was ever made

10  at the time . . . to characterize a particular alleged or proposed change as 'fundamental.'"

11  *Id.*  In reviewing and affirming the regional EPA's site-specific decision not to characterize

12  a change as fundamental, the Board found that the nature of the contamination and the plan

13  to excavate and remove the hazardous waste remained the same, and that the locations

14  required to be excavated and backfilled remained the same, but were slightly "expanded."

15  In short, "[t]he . . . cleanup proceeded almost exactly as contemplated in the ROD—there

16  was simply more contamination than expected."  *Id.* at *17.

17      Similarly, in *United States v. BASF-Inmont Corp.*, 819 F. Supp. 601, 609-10 (E.D.

18  Mich. 1993), *aff'd*, 52 F.3d 326 (6th Cir. 1995), the district court held that a change in the

19  remedial action at issue—the choice to conduct on-site incineration of hazardous substances

20  instead of off-site—was not a fundamental change and did not require an amendment to the

21  record of decision.  The court concluded that the incineration of materials was "basic" to the

22  remedial plan.  *Id.* at 609.  But, looking to the "cost, performance, and scope" of the

23  remedial action as directed by the EPA, the court found that the cost estimates were not

24  altered because the estimates for maintaining the original cleanup plan were rapidly

25  increasing; that the amount of material being incinerated was not altered; and, because the

26  rates for destruction of hazardous materials remained constant, that the performance was not

27  altered.  *Id.*  In concluding that the change to on-site versus off-site incineration was not

28  fundamental, the court also noted that the record of decision at issue conditioned disposal of

1  the materials on the availability of compliant facilities and specifically provided for

2  revisions based on limited availability. *Id.*

3      Here, the subsequent adjustments to Tyco's remediation plan fit squarely within the

4  examples of significant differences described in *Atlantic Richfield*, *NCR*, and *BASF-Inmont*.

5  First, as the court held in *NCR*, an increase in cost—even a significant one—alone does not

6  indicate a fundamental change. Rather, a fundamental change goes to the basic nature of

7  the remedy. Thus, the fact that the response ultimately cost more than Rowe originally

8  argued was necessary does not fundamentally change the action. Second, as in *Atlantic*

9  *Richfield*, the discovery of more hazardous material to be cleaned up also does not make a

10 change fundamental. Tyco's remedial action plan conditioned the "lateral and vertical

11 extent of the proposed excavation area" on the results of additional sampling, which was

12 what lead to additional excavation, just as in *BASF-Inmont*. Thus, the fact that there may

13 have been more contamination at the site that required an additional area to be excavated

14 does not render the cleanup fundamentally changed. And finally, that total excavation of

15 the entire site was not feasible, and thus portions of the site were eventually capped, also

16 does not fundamentally change the plan. As in *BASF-Inmont*, the performance of the

17 plan—namely mitigating the effects of PCB contamination—was not altered, the costs were

18 rising for excavation and thus capping did not alter the costs, and the scope remained the

19 same, as the site as a whole was rendered safe. Furthermore, the EPA approved the

20 amendments based on unanticipated, site-specific challenges that made excavating the

21 entire contaminated area infeasible. No requests were made to characterize the change as

22 fundamental or to reopen the plan to public comment. The Court is "particularly

23 disinclined" to do so in hindsight. *Atlantic Richfield,* 1999 WL 504706, *16.

24     But even if capping of areas along the property boundary when further excavation

25 became infeasible is considered a fundamental change, ultimately, only the "*costs* of

26 response" must be consistent with the NCP. 42 U.S.C. § 9607 (a)(4)(B) (emphasis added);

27 40 C.F.R. § 300.700(c)(2) ("Responsible parties shall be liable for necessary costs . . .

28 consistent with the NCP"). The Ninth Circuit has not addressed this issue, but both the

1  Eighth Circuit and the Tenth Circuit have held that "[t]he plain language of the statute

2  speaks of costs rather than actions," and even where actions may be inconsistent with the

3  NCP, consistent costs are recoverable. *United States v. Burlington N. R.R. Co.*, 200 F.3d

4  679, 695 (10th Cir. 1999).

5      The Eighth Circuit held that even where the Minnesota Pollution Control Agency

6  acted arbitrarily and capriciously by pursuing an "untried, high-risk, high-cost remedy;

7  failed to adequately study the nature and extent of the contamination problem in advance;

8  and failed to monitor . . . and modify the remedy when the unevaluated problem turned out

9  to be greater than anticipated," that the state could recover costs that were consistent with

10  the NCP. *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1025 (8th Cir.

11  1998). Similarly, the Tenth Circuit held that the EPA's failure to amend the record of

12  decision and seek public comment on the fundamental change to remove solidified tar heels

13  from rail cars by hand, rather than pump liquid sludge, and incinerate, rather than recycle,

14  the tar heels, which resulted in half of the hazardous waste being incinerated—a remedy

15  specifically rejected during the selection phase—and a 61 percent increase in cost, that the

16  EPA could still recover the NCP-compliant costs it incurred. *Burlington N. R.R. Co.*, 200

17  F.3d at 694, 695.

18      "[P]roof that . . . remedial actions were inconsistent with the [NCP] is not a complete

19  defense to liability for the cost of remediating a site." *Id.* at 695. The Tenth Circuit

20  analogized the difference between actions and costs to "the difference between breach and

21  damage under tort law." *Id.* Where a party proves "a breach of a duty to follow proper

22  administrative procedures," he "must further prove that the breach resulted in damages."

23  *Id.* "Damages in this case are *costs* that are inconsistent with the [NCP]." *Id.* (emphasis in

24  original). Here, even if Tyco's decision to cap the portions of the site that could not safely

25  be excavated is considered a fundamental change, Rowe must still prove that the change

26  resulted in avoidable and unnecessary costs. It has not. The Court concludes that Tyco's

27  response costs of $3,970,126 were both necessary and consistent with the NCP.

28  //

1    **2.    Rowe is a responsible party subject to liability.**

2    CERCLA imposes strict liability for environmental contamination on "any person

3    who at the time of disposal of any hazardous substance owned or operated any facility at

4    which the hazardous substances were disposed of." 42 U.S.C. § 9607(a); *Burlington*

5    *Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 609 (2009). A "person" is

6    defined as including a firm, corporation, or commercial entity. 42 U.S.C. § 9601(21). The

7    term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or

8    placing of any solid waste or hazardous waste into or on any land or water so that such solid

9    waste or hazardous waste or any constituent thereof may enter the environment . . . ."

10    42 U.S.C. § 6903. Under CERCLA, potentially responsible parties are liable for "necessary

11    costs of response incurred by any other person consistent with the national contingency

12    plan." 42 U.S.C. § 9607(a)(4)(B). CERCLA liability can be found solely on circumstantial

13    evidence. *Franklin Cnty.*, 240 F.3d at 547.

14    Here, Tyco has presented evidence that Rowe's predecessors-in-interest operated a

15    manufacturing business from 1966 to 1970 that used significant quantities of PCBs. It is

16    uncontested that there was a "release," defined as "any spilling, leaking, pumping, pouring,

17    emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into

18    the environment." 42 U.S.C. § 9601(22). Significant PCB contamination has been found

19    throughout the site, in the soil and concrete slab, as well as in the building. *See, e.g.*, Exs.

20    53, 204. It is also uncontested that Rowe is the successor-in-interest to Hill Magnetics. Hill

21    used the two types of Aroclor found to have contaminated the site. Accordingly, Rowe is

22    liable under CERCLA.

23    **C.    Apportionment Is Not Appropriate.**

24    Although CERCLA imposes a "strict liability standard," it does not mandate "joint

25    and several" liability in all cases. *Burlington Northern*, 556 U.S. at 613. "CERCLA

26    defendants seeking to avoid joint and several liability bear the burden of proving that a

27    reasonable basis for apportionment exists." *Id.* at 614. When deciding whether to apportion

28    costs, a court looks to whether the harm is divisible and whether the apportionment is

1   reasonable. *Id.* at 614-15 ("When two or more causes produce a single, indivisible harm,

2   'courts have refused to make an arbitrary apportionment for its own sake, and each of the

3   causes is charged with responsibility for the entire harm.'") (quoting Restatement (Second)

4   of Torts § 433A).  "Apportionment is improper 'where either cause would have been

5   sufficient in itself to bring about the result, as in the case of merging fires which burn a

6   building.'" *United States v. NCR Corp.*, 688 F.3d 833, 839 (7th Cir. 2012) (quoting

7   Restatement of Torts § 433A(2), cmt. i).

8          The possibility of apportionment is a matter of law for the court to decide.

9   Restatement (Second) of Torts § 434.  In making its legal conclusion, however, the court

10  must consider facts such as "who contributed to that pollution, how the pollutant presents

11  itself in the environment after discharge, and similar questions." *NCR Corp.*, 688 F.3d at

12  838.  Evidence supporting divisibility must be concrete and specific. *United States v.*

13  *Hercules, Inc.*, 247 F.3d 706, 718 (8th Cir. 2001).

14         When determining whether harm is divisible under CERCLA, the Ninth Circuit looks

15  to "the contamination traceable to each defendant." *United States v. Burlington Northern*,

16  520 F.3d 918, 939 (9th Cir. 2008), *overruled on other grounds by Burlington Northern*, 556

17  U.S. 599.  "Distinct harms are those that may properly be regarded as separate injuries," and

18  may be differentiated, for example, "based on geographical considerations, such as where a

19  site consists of non-contiguous areas of soil contamination, or separate and distinct

20  subterranean plumes of groundwater contamination," *Hercules, Inc.*, 247 F.3d at 717-18

21  (internal citations and quotation marks omitted), or based on different hazardous substances,

22  *Burlington Northern*, 520 F.3d at 943.  A single harm also may be "divisible because it is

23  possible to discern the degree to which different parties contributed to the damage," by

24  looking to, for example, relative quantities of hazardous materials discharged. *Hercules*,

25  247 F.3d at 718; *see also In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 903 (5th Cir. 1993)

26  (holding volume apportionment reasonable where only one hazardous substance was

27  detected, each potentially responsible party operated at mutually exclusive times, and there

28  //

1  was sufficient evidence to make a reasonable and rational approximation of each

2  defendant's contribution to the contamination).

3      Rowe argues for apportionment based on the fact that several potentially responsible

4  parties, each of whom used PCBs, operated at the site at different times and exclusive of

5  one another.  Rowe points to Raychem's 44 Wire operations, the railroad, itself, and an

6  orphan share of PCB contamination without any known source.  Dkt. No. 546 at 11-18.

7  Based on the square-footage of the site that the four potentially responsible parties each

8  used, and differentiating between building use and land use, Rowe argues that only 30

9  percent of the costs of remediation should be apportioned to it.  *Id.* at 18-20.

10      Tyco argues that Rowe is 100 percent liable for the costs of remediating the site

11  because the only PCB contamination found at the site corresponds exactly to the chemical

12  signature of the PCBs used by Rowe's predecessors.  Dkt. No. 549 at 8-9.  Tyco asserts that

13  Rowe has failed to put forth any evidence that the railroad or other "orphan share"

14  contributed to PCB contamination.  Regarding Raychem's production of 44 Wire, Tyco

15  points to the fact that the extrusion process would not have resulted in the two types of PCB

16  contamination found at the site, Aroclor 1254 and 1260, and even assuming 44 Wire did

17  contaminate the site, Raychem used only 3.7 percent of the weight of PCBs Hill used.  Dkt.

18  No. 549 15-16.

19      Considering the facts of this case—the type of PCB contamination, namely Aroclor

20  1254 and 1260, the potentially responsible parties who used PCBs at the site, the time each

21  operated on the site, and the fact that Tyco does not seek to recover costs associated with

22  demolishing the building—the Court concludes that apportionment is not appropriate.  This

23  is a "single harm" type of case, where one hazardous substance was remediated, PCBs

24  called Aroclor 1254 and 1260.  The PCBs Monsanto shipped to Hill contained Aroclor 1254

25  and 1260.  In addition, Tyco has shown that dielectric fluids of the type used in

26  transformers by Hill are the only PCB use on site that mixes PCBs and TCBs together, and

27  the contamination at the site contains both TCBs and PCBs.  Rowe has not proved that any

28  other potentially responsible party contributed to the volume of the two types of Aroclor

present at the site, nor proved that dividing the site by square-footage can reasonably approximate the harm caused by each potentially responsible party.

Moreover, where "a chemical is harmful when it surpasses a certain amount" and contamination surpassing the amount determined safe for human health is traceable to one defendant, apportionment is not appropriate, irrespective of whether other defendants may have also contributed to further contamination of the facility. *NCR Corp.*, 688 F.3d at 839-41 (holding that defendant responsible for 6-9% of contamination was nevertheless liable for entire clean up because its "discharge of PCB was sufficient to create a condition that is hazardous to human health under EPA guidelines" and defendant failed to refute contention that its PCB discharge alone required approximately the same remedial measures). Here, Rowe's expert witness, Sabadell, testified that half a coffee cup of Askarels spilled on the ground could result in contamination findings of a thousand milligrams per kilogram and that a few drops on the ground could result in contamination in the hundreds. Tr. 1120:21-1121:6. Evidence indicates that Askarels did indeed drip onto the ground during Hill's transformer operations. The environmental screening level for PCBs, above which contamination must be addressed, is 0.74 mg/kg. Tr. 384:4-9, 440:10. Because Rowe's contamination alone surpassed the EPA limits for health and human safety, apportionment is not appropriate, irrespective of whether Tyco also contributed to the contamination.

Two flames started this contaminating "fire." Rowe has not established a reasonable basis for dividing the harm or apportioning the liability. It is jointly and severally liable.

**D.    Rowe Is Entitled to Some Equitable Contribution.**

The concept of apportionment is "distinct from contribution or allocation of damages." *Hercules*, 247 F.3d at 718. Where there is no reasonable basis for dividing causation, equitable factors—such as the "Gore factors"[5]—may nevertheless have an impact on the damages each jointly and severally liable, potentially responsible party incurs. *Id.* at

---

[5] "[N]amed after a failed attempt to amend CERCLA[,] Congress rejected the amendment that would have listed the Gore factors as the basis for allocating liability. The trial court is therefore not limited to the Gore factors." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000).

718-19.  "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)," and "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

### 1.     Rowe is not entitled to contribution from Tyco.

Rowe argues that Tyco should bear some of the costs of remediation because it operated at the site for decades before it attempted to clean up the PCB contamination, and that the entire cleanup was motivated by Tyco's desire to maximize its profits when selling the site.  As long as there was a threat to human health and safety, such as the release of hazardous materials, and the response action addresses that threat, a plaintiff's motive for cleaning up the property is irrelevant.  *Carson Harbor*, 270 F.3d at 872.  Rather, "[t]he statutory limitation to necessary costs of cleaning up" is a sufficient "check on the temptation to improve one's property and charge the expense of improvement to someone else."  *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995).  As discussed in detail above, Tyco's costs were necessary, meaning they were cost-effective and limited to those costs closely tied to cleaning up the PCB contamination at the site.  The Court therefore rejects this basis for contribution.

Rowe also asserts that Tyco should contribute based on the fact that Hill operated a failing business, while Raychem profited from its 44 Wire operations.  First, the Court fails to see how an unprofitable polluter should pay any less a profitable one.  Second, the Court has already declined to apportion damages based on Raychem's production of 44 Wire; Rowe cannot reargue the point under contribution.

Next, Rowe asserts that it should be credited with already having contributed the $90,000 Redwood paid Raychem in 1973 when Raychem purchased the site, and that to exclude this contribution, which Rowe calculates as $466,000 in today's dollars, would allow Tyco to recover doubly.  The Court excluded the release under Federal Rule of Evidence 901(b) for failure to authenticate properly the document.  Tr. 1213:4-7, 1218:8-12.  Accordingly, because Rowe has no evidence that such a release existed, let alone that

it was for the specific purpose of remediating the site, it is not an adequate basis for contribution.

**2.      Equity entitles Rowe to contribution from the settlement agreements.**

Lastly, Rowe argues that its liability should be reduced by the amounts that Tyco received from its settlement agreements with Redwood and Carlisle.  Rowe argues that Carlisle's and Redwood's share of liability should be no less than the settlement amounts. Tyco contends that Rowe has failed to establish any basis for assigning proportional liability to Redwood or Carlisle.

Judge Fogel previously held that if the settlements of Redwood and Carlisle would contribute to the costs owed by other liable parties, such as Rowe, then the settlement amounts would be applied under the proportional share method of the Uniform Comparative Fault Act.  Section 6 of the Act states that a "claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation."  Unif. Comparative Fault Act § 6.  A released party's equitable share is based on findings of the amount of damages each claimant is entitled to recover and the percentage of the total fault allocated to each released party.  *Id.* § 2(a).  To determine the percentage of fault, the Court "consider[s] both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed."  *Id.* § 2(b).

Tyco's claims against Redwood and Carlisle were based on the fact that Carlisle was the former sublessor and alleged guarantor of Hill.  FAC ¶¶ 2-7.  Redwood owned the site from the late 1950s and leased it to Carlisle from 1962 until mid-1973, when it was sold to Raychem.  Although CERCLA imposes strict liability for environmental contamination on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which the hazardous substances were disposed of," 42 U.S.C. § 9607(a); *Burlington Northern*, 556 U.S. at 609, the conduct of Carlisle and Redwood and the causal connection between that conduct and the release of PCBs at the site will determine their percentage of fault.

No evidence has been admitted that Carlisle or Redwood caused the release of PCBs. Rowe has introduced evidence that Carlisle subleased to Hill, Ex. 689, and that Redwood owned the site and leased the property to several tenants before eventually selling it to Raychem, *see* Exs. 601, 602, 603, 630, 684, but none of this evidence establishes a causal connection between these companies and the contamination.  Rowe, in its Opposition to Tyco's Motion for Settlement Approval, argued that Carlisle and Redwood both knew of the nature of Hill's operations, and profited from the lease agreements on the site, and that therefore, Carlisle, Redwood, and Rowe should each bear equal portions of the liability. Dkt. No. 217 at 4.  In its post-trial brief, however, Rowe presents no evidence that would allow the Court to determine the percentage of liability to attribute to Redwood and Carlisle.  Dkt. No. 546 at 31.  The evidence demonstrates merely that they owned or subleased the property to Hill, which operated a business that used PCBs.  No evidence demonstrates that Carlisle or Redwood knew that their tenants were polluting; indeed, at the time of the releases in evidence, PCBs were not thought to be harmful.  Furthermore, while it is likely that Carlisle knew that Hill manufactured electrical transformers, no evidence was presented that Redwood knew anything of Hill's operations.  Beyond the contractual relationship tying Carlisle and Redwood to the site and to Hill, the evidence simply does not establish a causal relationship between Carlisle's and Redwood's conduct and the release of PCBs.

Rowe also argues that Redwood is liable for the PCB contamination caused by railroad operations and flooding of the rail spur, because Lampert was the general partner of both Redwood and the railroad.  Dkt. No. 556 at 18-19.  This argument overlooks the fact that no evidence was admitted that establishes the use of PCBs by this railroad at this site. As the record stands, if the Court were to assign a percentage of fault to Carlisle and Redwood, it would be arbitrary.  This the Court will not do.

Nevertheless, given CERCLA's strong policy for preventing double recovery, the Court finds that it would be equitable to reduce Rowe's liability for Tyco's NCP-compliant response costs by the amount that Tyco already received from its settlements with Carlisle

1   and Redwood. *See Boeing*, 207 F.3d at 1189-90 (noting that equity requires a plaintiff not

2   to recover twice—one via settlement and once via litigation—for the same response costs).

3   Tyco received $425,000 from its settlements with Redwood and Carlisle for the

4   contamination of PCBs on the site. Dkt. No. 233. Tyco spent $3,970,126 in response costs

5   that were necessary and consistent with the NCP. Accordingly, Tyco may recover

6   $3,545,126 from Rowe.

7   **E.   Declaratory Judgment**

8   Tyco seeks a declaration that its response action was NCP compliant. Dkt. No. 514 at

9   8. In an action for recovery of costs under CERCLA, "the court shall enter a declaratory

10  judgment on liability for response costs or damages that will be binding on any subsequent

11  action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). A

12  claim for declaratory relief under CERCLA is ripe when hazardous substances have been

13  disposed of and plaintiff has spent "some money responding to an environmental hazard."

14  *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1005 (9th Cir. 2010).

15  "[I]f a plaintiff successfully establishes liability for the response costs sought in the initial

16  cost-recovery action, it is entitled to a declaratory judgment on present liability that will be

17  binding on future cost-recovery actions." *Colton*, 614 F.3d at 1007. "The costs and time

18  involved in relitigating issues as complex as these where new costs are incurred would be

19  massive and wasteful. Declaratory relief allocating future costs is therefore consistent with

20  the broader purposes of CERCLA." *Boeing Co.*, 207 F.3d at 1191. "[I]t is not necessary to

21  determine the nature and amount of future response costs prior to awarding a declaratory

22  judgment." *United Alloys, Inc. v. Baker*, 797 F. Supp. 2d 974, 1003-04 (C.D. Cal. 2011)

23  (allocating two-thirds of any future NCP-compliant response costs to defendant where

24  defendant was jointly and severally liable under § 9607 but entitled to one-third

25  contribution from plaintiff under § 9613).

26  Although the Court does not need to determine the amount of future response costs,

27  or even make a finding that they will occur, the Court notes that, at the very least, the cap

28  will require monitoring for thirty years. Johnson's calculation of Tyco's necessary response

1  costs does not include projections for the cost of monitoring the cap. Dkt. No. 298. Thus,

2  declaratory judgment will facilitate allocating these future costs and prevent complex and

3  duplicative litigation.

4       As discussed in Part IV.B.1., Tyco's response costs were necessary and consistent

5  with the NCP. Rowe is jointly and severally liable. Apportionment is not appropriate for

6  this case. Rowe is entitled, however, to contribution in the form of a reduction in its

7  liability in the amount of Carlisle's and Redwood's settlement amounts. This is a one-time

8  contribution, however; it is based only in equity and CERCLA's policy against double

9  recovery, and it does not reflect any assignment of proportional liability assigned to Carlisle

10  and Redwood. Accordingly, Rowe is 100 percent responsible for any future NCP-

11  compliant response costs Tyco incurs.

12  **F.     Tyco Is Entitled to an Award of Prejudgment Interest.**

13       CERCLA allows an award of interest on amounts recoverable under 42 U.S.C.

14  § 9607(a). "Such interest shall accrue from the later of (i) the date payment of a specified

15  amount is demanded in writing, or (ii) the date of the expenditure concerned." *Id.* The

16  Ninth Circuit has not addressed how specific a plaintiff's demand for damages needs to be

17  in order to recoup prejudgment interest. Several circuits have opined that CERCLA does

18  not require a plaintiff to demand an exact dollar amount; rather plaintiff's demand must

19  only give defendants "full knowledge of their contaminating activities which gave rise to

20  the response costs." *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1019 (8th Cir.

21  2007) (holding that the district court did not abuse its discretion in awarding prejudgment

22  interest where demand did not specify the amount sought from each third-party defendant);

23  *Bell Petroleum*, 3 F.3d at 908 (holding that "[a]lthough the complaint does not specify an

24  exact amount . . . it constitutes a sufficient written demand for payment" and awarding

25  prejudgment interest from the date of the complaint); *Bancamerica Comm. Corp. v. Mosher

26  Steel of Kansas, Inc.*, 100 F.3d 792, 801, *amended by* 103 F.3d 80 (10th Cir. 1996) (holding

27  that the district court abused its discretion by refusing to grant an award of prejudgment

28  interest where plaintiff's complaint alleged it was seeking reimbursement plus interest for

1  response costs in excess of $1 million); *but see United States v. Consolidation Coal Co.*,

2  345 F.3d 409, 416 (6th Cir. 2003) (holding that a third-party complaint seeking a total

3  response cost of $47 million from 59 defendants was insufficiently specific as to each

4  defendant to satisfy the statutory prerequisite for an award of prejudgment interest).

5       Both the Eighth and Tenth Circuits have affirmed awards of prejudgment interest

6  where some dollar figure was alleged in the complaint. *See K.C. 1986 Ltd. P'ship v. Reade*

7  *Mfg.*, Case No. 02-cv-00853 NKL, 2005 WL 6124841, *2-*3 (W.D. Mo. Apr. 4, 2005),

8  *aff'd in part, rev'd in part, and remanded sub nom. K.C.1986 Ltd. P'ship v. Reade Mfg.*,

9  472 F.3d 1009 (8th Cir. 2007) (finding that plaintiff made multiple demands for specific

10  dollar amounts which reflected either the entire amount or a significant portion of the

11  response costs it had actually incurred, as well as figures for prejudgment interest );

12  *Bancamerica*, 100 F.3d at 801 (plaintiff alleged response costs in excess of $1 million in the

13  complaint).  The Fifth Circuit has taken a more expansive approach and held that a

14  complaint that does not specify a dollar amount is sufficient to satisfy § 9607(a). *Bell*

15  *Petroleum*, 3 F.3d at 908.

16       On the one hand, the statute states unequivocally that interest accrues from the date a

17  "specified amount is demanded in writing"; on the other hand, "denying an award of

18  prejudgment interest [for failure to specify a dollar amount] would effectively penalize a

19  party who timely paid under the statute, and could provide a windfall to a party who either

20  attempted to frustrate or delay attainment of CERCLA's goals." *Dow Chem. Co. v. Sinclair*

21  *Oil Corp.*, 3 F. Supp. 2d 1252, 1254 (D. Wyo. 1998).  Furthermore, CERCLA requires

22  substantial compliance, not a checklist approach, because the latter could "defeat cost

23  recovery for meritorious cleanup actions based on a mere technical failure by the private

24  party." *Carson Harbor*, 287 F. Supp. 2d at 1160 (C.D. Cal. 2003) (internal citation and

25  quotation marks omitted).

26       Here, Rowe was served with a copy of the First Amended Complaint, the first

27  complaint that named it as a defendant, on about January 26, 2007.  Stipulation Extending

28  Rowe's Time to Respond at 1, Dkt. No. 12.  Therefore, the prejudgment interest at issue

1  here is $54,872.72.  Dkt. No. 298.  The First Amended Complaint requested "all necessary

2  Response Costs incurred by Plaintiff in responding to the released Hazardous Substances"

3  under 42 U.S.C. § 9607(a).  Dkt. No. 4 at 9.  Although Tyco defines "Response Costs" in

4  paragraph 27 of the First Amended Complaint, it did not include a dollar amount in its

5  pleading.  Dkt. No. 4; *see also* Tyco's Original Complaint at 7-8, Dkt. No. 1 (seeking

6  "Response Costs").  Tyco did publish estimates in its remedial plans, giving Rowe an idea

7  of its potential liability.  Tyco did not present Rowe with a specific demand for its actual

8  response costs, however, until it produced the report of its expert, Johnson, in December

9  2012.  Ex. 298.

10      Nevertheless, in light of CERCLA's holistic and substantial compliance approach to

11  the procedural aspects of remediation, and its overarching and firm policy to encourage

12  parties to clean up environmental pollution, the Court awards Tyco prejudgment interest in

13  the amount of $54,872.72.  Tyco should not be penalized for its responsiveness.

14  **G.   Tyco's State Law Claims Fail.**

15      Tyco also brought claims against Rowe under California's Hazardous Substance

16  Account Act ("HSAA"), and sought equitable indemnification, declaratory relief, and

17  attorneys' fees under California law.  Dkt. No. 4 at 11-14.  "Similar to CERCLA,

18  California's HSAA provides for civil actions for indemnity and contribution and expressly

19  incorporates CERCLA's liability standards and defenses." *Adobe Lumber, Inc. v. Hellman*,

20  658 F. Supp. 2d 1188, 1192-93 (E.D. Cal. 2009); *see Castaic Lake Water Agency v.*

21  *Whittaker Corp.*, 272 F. Supp. 2d 1053, 1084 (C.D. Cal. 2003) ("HSAA create[s] a scheme

22  that is identical to CERCLA with respect to who is liable.");  *Goe Eng'g Co., Inc. v.*

23  *Physicians Formula Cosmetics, Inc.*, Case No. 94-3576, 1997 WL 889278, at *23 (C.D.

24  Cal. June 4, 1997) ("California's [HSAA] imposes essentially the same standards of

25  liability as CERCLA.").  Important to this case, however, the "HSAA does not impose

26  liability for acts that occurred prior to January 1, 1982, if those acts did not violate existing

27  federal laws at the time they occurred." Cal. Health & Saf. Code § 25366(a).  This would

28  preclude recovery for contamination that occurred before 1976 when PCBs were first

regulated under the Toxic Substances Control Act of 1976.  *See* 41 C.F.R. § 14133 (1976 PCB regulations); 40 C.F.R. § 761.

Rowe's predecessors stopped operating at the site in 1970.  PCBs were not yet then regulated.  Accordingly, the HSAA does not impose liability for Hill's contamination.  In addition, CERCLA precludes recovery for the same response costs under two statutory frameworks.  42 U.S.C. § 9614(b) ("Any person who receives compensation for removal costs or damages or claims [under CERCLA] shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law.").  For these reasons, Tyco's state law claims fail.

## V. CONCLUSION

In remediating the site, Tyco incurred response costs that were necessary and consistent with the NCP.  Rowe is jointly and severally liable for the contamination at the site caused by its predecessors-in-interest.  Apportionment is not appropriate in this case, and the Court declares that Rowe is liable for 100 percent of the response costs in this action as well as all future, NCP-compliant costs Tyco may incur remediating PCB contamination at 2201 Bay Road, Redwood City, California.  Accordingly, Rowe is liable to Tyco for $3,970,126.

Nevertheless, Tyco may not double recover, and so Rowe's liability for the costs Tyco has already incurred is reduced by the amount of Tyco's settlements with Carlisle and Redwood, which total $425,000.  Tyco is also entitled to an award of prejudgment interest in the amount of $54,872.72.  In total, Tyco is entitled to recover $3,599,998.72 from Rowe. The Court will enter judgment against Rowe in this total amount and terminate the case.

IT IS SO ORDERED.

Date: March 31, 2013

_____
Nathanael M. Cousins
United States Magistrate Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case Number:

PLTF EXHIBIT
NO. 304

Date
Admitted:_____

By:_____
Lili M. Harrell, Deputy Clerk

----------------------------------------



Figure 10

Explanation

⊕ Additional soil assessment sample location
⊕ Additional systematic soil sample location
⊕ Confirmation soil sample location
☐ Former Buildings

— Parcel Boundary
– – – Site Boundary (approximate)
Excavation area 1A = 2' BGS
Excavation area 1B = 8' BGS
Excavation area 2A = 5' BGS

Excavation area 2B = 8' BGS
Excavation area 2C = 2' BGS
Excavation area 3A = 3' BGS
Excavation area 4A = 2' BGS
Excavation area 4B = 4' BGS

Abbreviation:
BGS = below ground surface

0    50
Feet

SOIL EXCAVATION PLAN AND
SOIL SAMPLING LOCATIONS
Tyco Thermal Controls
2201 Bay Road
Redwood City, California

By: CED   Date: 04/04/2012   Project No. 012442010.0015

amec

Figure   9

TTC 22769

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case Number:

PLTF EXHIBIT
NO. 121A

Date
Admitted:_____

By:_____
Lili M. Harrell, Deputy Clerk

------------------------------------

**HILL MAGNE**

PLOT PLAN
TOTAL AREA 74,400 SQ. FT.

PRODUCTION-GENERAL . . . . . . . 62,700
ADMINISTRATIVE & ENGINEERING . . 5,400
LABORATORY & TEST . . . . . . . 3,000
WAREHOUSE & MISC. . . . . . . . . 3,300

TOTAL SQ. FT. . . . . . . . . . 74,400



UNIT 1

R.R. SIDING

UNIT 2

BAY ROAD

UNIT 3

OFFICES  LAB

Assembly

UNIT 4

UNIT 5

BAND  STOCK

Dock

PLAINTIFF

**United States District Court**
**Northern District of California**

Case No. CV-06-07164-SBA
Case Title Tyco Thermal Controls v.
Redwood Industrials, et al.

Exhibit No. _____ 121A _____

Date Entered _____

Richard W. Wicking, Clerk

By: _____  . Deputy Clerk

EXHIBIT
121-A
Potter

TTC 22163